IN RE INTEREST OF MARGARET BURBANKS,
MARY RIMA, AND MELODY RIMA,
CHILDREN UNDER THE AGE OF 18 YEARS.
STATE OF NEBRASKA ET AL., APPELLEES, V.
WAYNE RIMA AND SHIELA RIMA, APPELLANTS.

310 N.W.2d 138

Filed September 11, 1981. No. 43592.

Terry Malcom of Colfer, Lyons, Wood, Malcom & Goodwin for appellants.

Arlan G. Wine, Special County Attorney, for appellees.

Bert E. Blackwell, guardian ad litem, for minor children.

Heard before KRIVOSHA, C.J., BOSLAUGH, MCCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

CLINTON, J.

This appeal involves three separate actions for the termination of the parental rights of Wayne and Shiela Rima to three children, Margaret Burbanks, Mary Rima, and Melody Rima. The county court of Red Willow County, after hearing, granted the prayer for termination and, on appeal to the District Court, the judgment was affirmed. The three cases were consolidated for trial in the county and District Courts and for argument and briefing in this court.

The parents appeal to this court and make and argue the following assignments of error: (1) The evidence does not sustain the finding of the court that their parental rights should be terminated on the ground stated in Neb. Rev. Stat. § 43-209(6) (Reissue 1978), to wit, "reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination," made at the adjudication hearing, namely, that the parents have failed and neglected to provide "special care made necessary by the mental condition of the [children]," Neb. Rev. Stat. § 43-202(2)(d) (Reissue 1978); (2) It is not proper to terminate parental rights except for intentional conduct detrimental to or wanton disregard for the welfare of the children; and (3) It is improper and unlawful to terminate parental rights for the principal purpose of facilitating adoption when the record establishes that this is the purpose of the proceedings.

The joint brief of the county attorney and the guardian ad litem for the children does not directly join issue with the position taken by the parents in their brief. Rather, the appellees argue that proof of the Rimas' poor financial condition and lack of ability to provide adequate nutritional and basic child care justifies the termination. They also take the position that remedial measures taken under the court's supervision under the provisions of § 43-209(6) need not be directly related to remedying the conditions or situation upon which the adjudication was based: in this instance, the

alleged mental condition of the children and neglect of the parents to provide special care directed to that condition.

A proper perspective for determining the issues raised on this appeal can be set only by summarizing the statutory framework governing the proceedings and the actual proceedings as they occurred in this case.

The original jurisdiction of courts in juvenile matters is defined by § 43-202. Six areas or grounds of jurisdiction are defined. The particular section of that statute under which the court found it had jurisdiction, as alleged in the supplemental petition on which the case was tried, was that subsection which provides: "(2) Exclusive original jurisdiction as to any child under the age of eighteen years . . . (d) whose parent, guardian, or custodian neglects or refuses to provide special care made necessary by the mental condition of the child." Section 43-209 lists six grounds upon which parental rights may be terminated. The ground upon which the court terminated the parental rights was the following: "(6) Following upon a determination that the child is one as described in subdivision (1) or (2) of section 43-202, reasonable efforts, under the direction of the court, *have failed to correct the conditions leading to the determination.*" (Emphasis supplied.) § 43-209.

Neb. Rev. Stat. § 43-206.03 (Reissue 1978) prescribes the rules of procedure applicable to juvenile cases. The portion of the proceeding applicable in this case may be summarized as follows. Subsections (3) and (4) of the statute separate the proceedings into two parts. First, the court must determine whether or not the child comes within one of the categories described in § 43-202. This is referred to as the adjudication portion of the hearing, and in cases where subsections (1) and (2) of that statute are applicable, the finding must be supported by a preponderance of the evidence and the court must designate which subdivision or

subdivisions the child is within. The statute then provides that the court shall proceed to an inquiry into the proper disposition to be made of such child.

This court has held that parental rights may not be terminated except by clear and convincing evidence. *State v. Jenkins*, 198 Neb. 311, 252 N.W.2d 280 (1977). Review by this court is de novo on the record. *State v. Jenkins, supra.* We also may, of course, notice plain error not assigned. Neb. Ct. R. 8.a.2.(3) (Rev. 1977). We reverse the cause and remand to the District Court for further proceedings.

We, therefore, first examine the evidence to determine whether the adjudication finding that the parents neglected or refused to provide special care made necessary by the mental condition of each child is supported by a preponderance of the evidence and whether the determination made by the court that reasonable efforts by the parents under the direction of the court have failed to correct the condition is proved by clear and convincing evidence.

Before entering upon that inquiry, a brief reference as to what occurred procedurally is appropriate.

The original petition filed in the county court on May 25, 1976, alleged that the children were neglected because of the mental retardation of the parents and prayed for an award of temporary custody of the children to the Department of Public Welfare of Red Willow County. The parents, on June 4, 1976, signed a stipulation agreeing to the placement of temporary custody of the children in the Red Willow County Department of Public Welfare. A guardian ad litem was apparently appointed for the parents on the same day. The children had been removed from the home about the time of the filing of the petition in the latter part of May. Journal entries dated June 4, 1976, and November 10, 1976, recite that the Rimas were questioned by the guardian ad litem and that they understood the nature of the stipulation they had signed. There is in the record another order dated July 23,

1976, appointing a guardian ad litem. The reason for the multiplicity of these orders does not appear and the bill of exceptions contains no evidence with reference to the testimony.

After this, the guardian ad litem resigned because he had been elected or appointed county attorney and would have had a conflict of interest, and a special prosecutor was appointed.

On March 16, 1977, supplemental petitions were filed in the county court reciting that on *June 4, 1976*, each child was a neglected child and, without specificity, alleging that the parents "have repeatedly neglected the child and refused to give the child necessary parental care and protection." The supplemental petitions repeated the allegations that the parents were, because of mental deficiency, unable to discharge parental responsibilities and that the condition would continue for an indeterminate period. They further alleged that the child "suffers from certain mental and physical deficiencies and needs special parental care and it would be in the best interests of said child to terminate all parental rights."

A guardian ad litem for the parents was appointed on March 16, 1977, and a guardian ad litem for the children was appointed on June 17, 1977. The first hearing at which any evidence was adduced was on June 17, 1977. It is to be noted that this was more than 1 year after the proceedings were first begun. That hearing was the first of a series, continuing at intervals during the summer of 1977. At these hearings, the testimony covered the period beginning sometime in 1974, when, apparently, the Department of Public Welfare first began working with the Rimas, until the summer of 1977. At that time the children had been in foster care for more than a year.

At the conclusion of these hearings, on September 22, 1977, the two guardians ad litem and the special county attorney entered into stipulations as follows: "1. That the said [name of child] is a dependent and

neglected child within the meaning of Nebraska R.R.S., Section 43-206.03 and Nebraska R.R.S., Section 43-202 (2) (D), in that the parents, Wayne Rima and Sheila [sic] Rima, have neglected or refused to provide special care made necessary by the mental condition of the child.

"2. That the parties hereto jointly Stipulate that the Court may enter an Order granting the care, custody and control of said minor child to the Department of Public Welfare for placement in a Foster Home. That the Court shall further Order that the placement of said child in the custody and control of the Department of Public Welfare shall continue until such time as it is shown to the Court that Wayne Rima and Sheila [sic] Rima are able to provide the special care made necessary by the mental condition of the children or until further order of the Court.

"3. That Thomas Blount, Special County Attorney, in and for Red Willow County, Nebraska, Stipulates that the Court may enter an Order dismissing that portion of the proceedings pertaining to and praying for the termination of the parental rights of Wayne Rima and Sheila [sic] Rima." Pursuant to those stipulations, the court entered orders finding that: "IT IS THEREFORE, ORDERED, that the care, custody and control of the said [name of child], a child under the age of Eighteen (18) years, is granted to the Department of Public Welfare for placement in a Foster Home until such time as it is shown to the Court that Wayne Rima and Sheila [sic] Rima are able to provide the Special Care made necessary by the mental condition of the children or until further order of the Court.

"IT IS FURTHER ORDERED, that Wayne Rima and Sheila [sic] Rima, the parents of the minor child, shall work with and cooperate with the Department of Public Welfare and the Multi-County Social Service Unit in an effort to be able to provide for the Special Care made necessary by the mental condition of the

child and they shall make all reasonable efforts to correct the conditions leading to the determination herein."

In November 1978, the county attorney filed motions in each of the cases to terminate the parental rights. The motions recited that on June 4, 1976, the child was found to be dependent and neglected; that Multi-County Social Service Unit 122 (hereinafter M-CSSU) has made reasonable efforts to correct the conditions necessitating the removal of the child from the home, but the efforts have been unsuccessful in correcting said conditions; that the child has been living in a foster home since before June 4, 1976; and that the foster parents would make suitable adoptive parents and are willing to adopt if the parental rights are terminated.

On December 22, 1978, the county attorney filed a motion applicable to all three children to terminate parental rights. It, too, recited that the children had been neglected and dependent as defined by § 43-202(2); that on September 22, 1977, the three children had been found by the court to be dependent and neglected as defined by § 43-202(2)(d) for the reason that the parents, Wayne and Shiela Rima, neglected or refused to provide special care made necessary by the mental conditions of the children; that from October 3, 1977, to November 30, 1978, M-CSSU made reasonable efforts under the direction of the court to help correct the conditions leading to the determination stated in paragraphs 2 and 3, but these have been unsuccessful in correcting the conditions; and that it would be in the best interests of the children that parental rights be terminated.

In April of 1979, the disposition hearing was held, evidence was adduced, and on May 1, 1979, the court entered an order terminating the parental rights and awarding custody and control of the children to the Department of Public Welfare of the State of Nebraska. The findings upon which the order was based were

the following:

"1. Above said minor children have previously been found by this Court to be children as described in Subdivision (1) and (2) of Section 43-202[(2)] R.R.S. 1978 Cumulative Supplement.

"2. Reasonable efforts, under the direction of the Court, have failed to correct the conditions leading to the determination as hereinabove set forth in paragraph #1.

"3. It is in the best interest of said minor children to terminate the parental rights of natural parents, Wayne and Shiela Rima to said children.

"4. Care, custody and control of said minor children should be awarded to the State of Nebraska, Department of Public Welfare."

We will now summarize separately the evidence adduced at the two hearings. The period covered by the evidence at the adjudication hearing related to a period beginning sometime in 1974, when the Department of Public Welfare apparently began working with the Rima family, through the summer of 1977. At the time the children were removed from the home of their parents in the latter part of May 1976, their approximate ages were: Melody, 3 months; Mary, 19 months; and Margaret, 3 years 4 months.

Prior to their removal, Margaret was attending a school apparently operated by M-CSSU, called the Child Development Center (hereafter CDC). The function of this school was to enhance the social development of children having handicaps.

The evidence presented tended to support the conclusion that the Rima children were lagging in physical development and did not appear well nourished; that a sufficient quantity and variety of foods were not always on hand in the home; and that Shiela, the mother, lacked adequate knowledge in the matters of balanced nutrition and meal preparation. This evidence was based upon the testimony of a health department nurse who visited the home at

2-month intervals for a period of about a year and a half and a staff homemaker who visited the home about 80 times from July 1974 until September 1976. These two witnesses regarded their efforts to teach and motivate Shiela as unsuccessful.

A particular complaint made with reference to Melody was that the mother was feeding her whole cow's milk to which Karo syrup was added, instead of the formula which the doctor recommended. Shiela testified that she had used the whole milk and Karo syrup combination for 3 weeks before the child was removed from the home and that the prior use of the formula suggested by the doctor did not agree with the baby. She made the change on the recommendation of her mother. At birth, Melody weighed 6 pounds 4 ounces. At age 3 months she weighed 8 pounds 6 ounces, and at that time, a few days before removal, she was hospitalized for examination. After 6 months of foster care, Melody weighed 15 pounds 5 ounces, which was light for her age, approximately the fifth percentile.

No medical or other expert evidence was introduced to support the allegation of mental retardation of the parents. The head of the M-CSSU testified that, in her opinion, the Rimas did not have the mental capability to educate their children and did not have the mental ability to discharge parental responsibilities. The parents were called by the State as witnesses. The father testified that he had been an inmate of the Beatrice home for 10 years, ending in 1968. According to his testimony he was confined for a sexual crime that he was alleged to have committed. No records from the Beatrice home were admitted in evidence. He acknowledged that he is illiterate. His answers, however, were responsive to the questions asked. However, it may be inferred that he did not understand some of the questions. He was asked if he ever communicated with the children and whether his wife ever communicated with the children. As to himself,

he said, "No, not really." As to Shiela he said he did not know. However, later, when the questions were phrased differently, he indicated that both he and his wife talked to the children. He testified to the part he played in the care of the children, such as feeding one while Shiela fed the other, helping "potty-train" Margaret by putting her on the stool, giving "horseback" rides, and putting the children to bed at night. He stated that he loved his children and did not want them taken from him. He further testified as to the kind of meals prepared by his wife, which testimony contradicted that of the previous witnesses. Wayne's testimony was that Shiela prepared suppers which consisted of meat, potatoes, vegetables, and canned fruit.

He further stated that he had been trained at Milford as a short-order cook; however, the evidence does not indicate that he ever worked at that employment. His employment during his marriage had been for a roofing company as an operator of the hot pot; for a doctor (apparently a podiatrist) making, in Wayne's words, "patterns . . . for correcting the feet"; and as a dishwasher. He stated that he had worked for about a year in each of the jobs. All the jobs were at or near minimum wages, ranging from $2.30 to $3.25 per hour. He acknowledged that at times he had not worked and that this was because his stomach bothered him and he was sick on those occasions. He apparently did not understand arithmetic, as the total wages he said he earned during a 2-week period when he worked fulltime did not seem to correspond to the wage rate.

Shiela's answers were also responsive to the questions asked. Her testimony as to meal preparation contradicted that of the social workers. It is apparent that she is not a very intelligent woman. She testified that she asked that the "agreements" (to which we will make later references) be read and explained to her because she did not understand the big words. One of the social workers testified that when written

messages were sent to Shiela from the school, she always asked the social worker what they said. Shiela testified that she loved her children and did not want the children taken from her and that she would have liked to visit them more often than was permitted after they were taken away.

At the time in 1976 when the Rimas signed the consent to have the children placed in temporary care of the Department of Public Welfare, Shiela testified they were having financial difficulties, Wayne being unemployed at that time.

The evidence indicates that the family income consisted of Wayne's earnings, a disability check received by Shiela, and aid to dependent children. Shiela's disability check was $167.80 and was Supplemental Security Income. Her disability apparently made the family eligible for the ADC payments; the amount of the latter payment varied, depending upon Wayne's income, and, during the 2 years before the children were removed, it varied from the maximum of $294 when Wayne was unemployed, down to $122.46.

Shiela testified that her disability was because of difficulty with her eyes and with her hands. One of the social workers testified, apparently on a hearsay basis, that the disability was based upon her mental incapacity. Shiela had been receiving these payments since she was 17 years of age. At the time of the hearing she was 26.

The evidence as to the mental condition of the children consisted of the testimony of the director of the CDC and four short letter reports from physicians. A good deal of this evidence relates to a time after the children were taken from the home.

The director of the CDC made a first acquaintance with the two older children, Margaret and Mary, at the CDC in September of 1975. At that time Margaret would have been about 2 years 7 months of age and Mary about 11 months of age. She saw Melody at her home shortly after her birth. Margaret had been

attending the CDC from sometime prior to September 1975 and was still there at the time of the director's testimony on June 22, 1977, more than a year after being placed in foster care. Mary did not begin attending the center until January 1977, roughly 7 months after being placed in foster care.

The director of the school testified that Margaret was tested and then certain "goals" were established for her and the teaching was directed to accomplish those goals. These goals were established on October 13, 1975, when Margaret was 2 years 8 months of age and were, according to the witness' testimony, as follows: "Margaret will eat with a spoon without spilling it's [sic] baby's food; Margaret will pull her pants up after toileting without prompting; Margaret will put on an outside garment such as a coat; Margaret will spontaneously name 25 noun pictures; Margaret will point to familiar objects — this was once worked on in previous goals — in a book on request, objects that we knew she knew; Margaret will demonstrate an unspoken awareness of mind by not allowing personal objects to be shared; she will greet peers when reminded by saying 'hi'; she will match primary colors; she will obey commands of stop and go when on a walk; she will identify by pointing five body parts on command: ear, nose, mouth, eyes and hair."

As time went on, new "goals" were established. After 6 months Margaret did not speak in sentences, but had a vocabulary of about 60 words. The testing referred to in the paragraph above was referred to as the "Portage" test. It tested the child in five separate areas. The test was not designed to determine whether the child's environment was at fault or whether deficiencies were due to innate intelligence. The areas of testing were self-help, where a "normal" 3-year-old would have 47 specific skills; cognition, where the child should have 52; motor skills, where the child should have 74; language, where the child should have 53; and socialization, where the child

should have 49. Margaret, when tested, had 36 of the self-help skills, 40 of the cognition skills, 57 of the motor skills, 33 of the language skills, and 14 of the skills in socialization.

The testimony indicated that all children did not develop at the same speed, and the witness stated she did not know whether the tests took that into account or not. The only foundation laid for the validity of the Portage test was that it was used in other like schools in the State of Nebraska and had been developed by six people in the State of Wisconsin. By June of 1976 Margaret had achieved most of the goals. The witness rendered her opinion that Margaret was a mentally retarded child and recommended to the parents that when Margaret entered school she be placed in special education.

The witness further recommended that Margaret, whether she remained in foster care or returned to her parents, continue in the CDC. She also testified that a learning disability does not necessarily assume or show that there are environmental problems, and that learning disabilities can exist without environmental problems.

Melody was enrolled in the school in February 1977, that is, at the age of 1 year, and after she had been in foster care for about 9 months.

Mary entered the CDC in March of 1976 at about 18 months of age and about 2 or 3 months before she was removed from the home. Mary was not given the Portage test until January of 1977, after having lived in foster care for 7 or 8 months. She scored 34 out of 52 in cognition; 35 out of 47 in self-help; 51 out of 74 in motor development; 23 out of 53 in language; and 29 out of 49 in socialization. In the witness' opinion Mary was mentally retarded.

As previously mentioned, the sole medical evidence adduced was received in the form of letter reports from physicians. Two of these are extremely brief. The first was dated July 26, 1974. It recited that because of

the "mental limitations" of the parents and "the limited social and economic environment of the Rima child . . . she would benefit from the Child Development Center." Although no child was identified in the report, the date of the letter, taken together with the evidence we have already recited, would indicate that the child referred to was Margaret. A foundation for the various conclusions in the letter was not laid.

The second letter pertained to Mary and was dated March 19, 1976. It was addressed to the Red Willow County Welfare Department and stated: "In pursuant [sic] to our conversation I just want to affirm that Mary Alice Rima is physically fit for school. She needs more attention with regard to her social development, and also has a need for evaluation for her diet."

The third letter was dated May 24, 1976. It referred to "screening" examinations of the Rima children and stated that Melody had serious growth retardation, weighing only 8 pounds 6 ounces at 3 months, and that she had lost weight in the last month. It also stated that the child was anemic and needed better nutrition. As to Mary, it stated that she was a very little girl, in the tenth percentile for weight, and that she was very docile, which was unusual for her age. It suggested that she needed more adult attention and nutrition. As to Margaret, the report recited that she was 3 years of age, somewhat small for her age, and docile. It suggested that she needed more nutrition and perhaps more adult attention. The letter recommended that the infant, Melody, be admitted to the hospital.

The fourth letter related to Melody and was dated January 11, 1977. It referred to a medical history given by the director of the welfare department. It recited the birth weight was 6 pounds 4 ounces and that prenatal care was not given until 1 month prior to birth. It noted that there were no neonatal problems. At the time of examination she was in the fiftieth percentile for height and in the fifth percentile for weight, 15 pounds 5 ounces. Problems noted at that

time were: (1) Otitis for the past month for which she was being treated; and (2) Microcephaly (small skull), otherwise the skull was normal; the doctor "imagine[d]" the small skull was inherited, but would need skull measurements of the parents to determine whether their skulls were within normal limits; and (3) Developmental delays "most likely the result of the microcephaly, which again may well be hereditary in origin." He recommended that she be followed as to her weight as well as head circumference and that, depending on what the parents' head circumferences were and how Melody developed, perhaps future testing would be needed. He recommended she be entered in the CDC at McCook. It is to be noted that at this time Melody had been in foster care for 7½ months.

The foster father of Margaret was called, as was the first foster mother of Mary and Melody. Their testimony was limited to the period of the first 30 days that the children were in their care. The substance of the testimony of Margaret's foster father was that Margaret was very quiet, very obedient, and ate well; she did not sleep well at night; she played best with children about a year younger than herself; she had to be urged to get out of bed by herself; she was slow in speech and could not count; and she was thin compared with other 3-year-olds. She laughed when her foster parents played with her. He stated that he (and apparently his wife) wanted to adopt Margaret. He and his wife were the parents of a 9½-year-old daughter afflicted with cerebral palsy. When Margaret was first in the home, the following incident occurred. They placed their child in a wheelchair and put a pillow or other padding under her feet. Margaret, unknown to them, observed this and the next time the child was placed in the wheelchair by her father, Margaret, on her own initiative, obtained a pillow and put it in place for the child's feet.

The temporary foster parent of Mary and Melody

had these children in her care from May 1976 to the first of December 1976, and again had Melody in temporary care from January 1, 1977, to April 1, 1977. The foster mother had picked up Melody at the hospital in May 1976 after the child had been there for 3 days. At that time, the child weighed less than 10 pounds and was pale and limp. Mary had been picked up at the social service office within about 10 minutes of the time she was removed from her grandmother's home. Mary did not talk; she did not walk well, having a rather peculiar gait; she ate "voraciously"; and she ate with her fingers. Some time elapsed before she played with the other children. When she was received she had a distended stomach. A cleft lip was partially repaired surgically while the child was in her custody. It took about a month before Mary began to respond and want to play with her foster father.

Following removal of the children from the Rima home, the Rimas and the M-CSSU entered into two "agreements" prepared by the M-CSSU. The first covered the period from October 3, 1977, through January 11, 1978, and was signed by the Rimas; the second covered the period from January 12, 1978, through June 30, 1978, and was executed by the guardian ad litem for the parents but not by the parents. These agreements recited what was expected of the Rimas by the agency and what the agency would do. The first agreement required: (1) Wayne to maintain steady and full-time employment; (2) Wayne and Shiela to pay their bills on time; (3) Wayne and Shiela to live within their means and meet with the social worker once a week to work on budgeting, and Shiela to furnish receipts for all expenditures; and (4) Wayne and Shiela to keep the appointments made by the worker for visitations with the children. Visitations were one per month for 1 hour. Because the foster home was not in McCook, the visitations alternated between McCook and some other city, such as Lexing-

ton. The worker's responsibilities under the agreement were to help Shiela with budgeting; arrange for the monthly visitations; and evaluate the Rimas' progress in budgeting, stability of the home, and dependability in keeping scheduled appointments.

The second agreement made the same requirements of the Rimas but in much more detail. It, for example, gave priority to the payment of certain bills: rent, gas, and electricity, and required detailed record-keeping in the matter of the budget. It added these requirements: The Rimas purchase food stamps each month, visits by a staff homemaker to assist in planning nutritious meals, and attendance by the Rimas at parenting classes. It increased visitations by bringing all the children to the Rima home once a month for a 4-hour visitation and gave the Rimas the opportunity to visit Melody and Mary once a month in Lexington and Margaret in Culbertson.

On April 4, 5, and 6, 1979, trial on the issue of termination of parental rights was held. The guardians ad litem served as attorneys for their wards as they had from the time of their appointment. The county attorney had, prior to trial, filed a motion to permit psychological evaluation of the parents. On January 25, 1979, the court had ruled that the mental condition of the parents was not an issue and overruled the motion. The evidence adduced at the termination hearing was directed primarily to (1) whether or not the Rimas had fulfilled their "agreements," and (2) the results of psychological tests of the children, all of which took place while the children were in foster care.

The children were examined by Jack Dodge, a school psychologist. He tested Margaret on September 29, 1976, about 4 months after her removal from the home of her parents. This test was made in McCook when Margaret was 3 years 8 months old. He used the Stanford-Binet test and the result indicated to him an IQ of 70, which he described as "borderline mental retardation." He also gave her a Vineland "develop-

mental" test, the results of which he did not remember. He recommended that Margaret continue at the CDC where, as we have noted, she had been in attendance previous to the time she was taken from her home.

Mr. Dodge saw Mary on two occasions. The first was when she was about 1½ years of age, which was 2 months before her removal from the home, and again when she was 2 years of age. Part of this second examination was an interview of the persons who were at that time the foster parents. The first test which he administered indicated an IQ of 83. The second test indicated an IQ of 90, which was about 1 month behind her chronological age. These tests were designed to indicate the child's social age as compared with chronological age.

He examined Melody at 11 months of age. This would be about 8 months after her removal. Earlier he had testified that children under 1 year of age are very difficult to evaluate. He gave her a score of 73, indicating that she was 2 or 3 months delayed.

He stated that he could not express any opinion as to the cause of the "lags" in the children and could not express any opinion as to whether the "lags" were innate or the result of environmental factors.

The children were examined by Jerry Mandel, Ph.D., a psychologist, on December 17, 27, and 29, 1978, and he gave his opinion on the social and intellectual functioning of the children at that time. The bases of the opinion were histories given him by the then foster parents (which histories included what the foster parents had been told by the social agencies); reports of earlier examinations made at the Meyer Children's Rehabilitation Institute at the University of Nebraska Medical Center, which latter tests were not admitted into evidence but which are in the record; tests which he administered to Margaret and Mary; and observations he had made of Melody, as he considered her too young for testing.

The children's ages at the time of testing by Dr.

Mandel were, respectively, 5 years 11 months; 4 years 3 months; and 2 years 10 months. He gave the two older children three tests: the WISC, a standard IQ test for children; the Bender-Gestalt visual motor test; and the Draw-a-Person test. He stated that Margaret's IQ was on the borderline of normal and dull-normal, i.e., 90. In his written report, which is also in evidence, he stated that she was functioning at the low end of her intellectual ability. He indicated that he considered her visual motor skills to be at about the level of 3 years 4 months. He considered her vocabulary adequate for her age. He considered that she had the potential for normal development.

Mary scored 104 in her IQ test, a score of 100 being considered average. She was functioning at the level of a 5½-year-old in cognitive skills. Her articulation was unclear, she had a vocabulary of 2,000 words, and she spoke in sentences. This latter information was not based on testing, but on history received from the foster parents.

Melody was functioning at a developmental level considered on a par with her chronological age. The substance of Mandel's conclusions was that the children had not, between birth and 3 years of age, received the stimulation necessary for the social growth at normal rates.

In addition to the two psychologists, the State called three social workers, three of Wayne's former employers, two representatives of creditors of the Rimas, and the present foster mothers of the three girls. We will attempt to summarize their testimony in an organized fashion, although it is somewhat difficult because it was, for the most part, presented in an unorganized way.

During the years 1977 and 1978 and previously, Wayne worked for two roofing contractors. This work was seasonal, covering about 5 or 6 months of the year with interruptions because of inclement weather. From one employer, Wayne earned $562.65 in 1977 and

$356.75 in 1978. In 1978 he also worked for another roofer, being employed from April 5 through August 16. The work was 5 days per week. He originally worked for $3 an hour but later the pay was raised to $3.25. Except for a period in April or May when Wayne was injured, he worked regularly except in July and August when the regularity tapered off. Wayne was not fired. This employer believed he, at that time, went to work for the Cornbelt Chemical Company. He considered Wayne an average worker, although during the last part of his employment he missed more work than the other employees. Wayne's employment with Cornbelt Chemical was, according to his supervisor, only a temporary job when help was needed. He worked there from August 14 to August 19, 1978.

Other evidence of family income came through the testimony of a social worker in connection with the matter of whether the Rimas were living within their income and accounting by receipts for all expenditures. This testimony covered the period beginning October 1977 through November 1978. The source of the witness' information was the accountings rendered by the Rimas. This indicated a family income for the period (excluding September 1978 for which the witness had mislaid the information) of $5,618.20. The Rimas could furnish receipts for only $4,129.93. One of the social workers testified that in the wintertime Wayne was unable to obtain employment.

The testimony with reference to the matter of visitations with the children showed that the Rimas kept all of their scheduled visitations for McCook. However, all except one of nine appointments scheduled for Lexington were canceled. Some of these, the number not specified, were canceled by the M-CSSU. A social worker testified that some of the cancellations by the Rimas were because they did not have a car or did not have money for gasoline. Related to this evidence is the testimony of one of the social workers. When asked if the Rimas spent money for luxuries or un-

necessary things, she replied that they had purchased a washing machine, a television set, a coffeemaker, and "I believe" two vehicles. So, on the one hand, it appears that the M-CSSU was complaining that appointments in Lexington were not kept, yet, on the other, it considered the purchase of an auto, which in light of the Rimas' income must have been a clunker, as a luxury. The witness also testified that Shiela had requested that more of the visits be scheduled in McCook. The worker also testified that the Rimas took two automobile trips, one of which, at least, was at a time when a visitation could have taken place.

The evidence indicates that the Rimas attended only one of nine "parenting" sessions.

Relative to the matter of paying bills on time, the evidence was as follows. The Rimas paid $100 for rent. It apparently was never delinquent and was the first thing paid. Two kinds of bills were not paid regularly and on time. These were the gas bill and the telephone bill. The Rimas had telephone service only during the period June 15 to September 11, 1978. On the latter date, $33.77 was unpaid and telephone service was disconnected by the company. The evidence with reference to the gas bill covers the period June 10, 1976, to April 5, 1979. The Rimas did not pay their gas bills dated 3-15-77, 4-11-77, 5-10-77, and 6-10-77, totaling $112.17, and service was disconnected. They apparently went without gas service thereafter until on October 11, 1977, when the Crisis Intervention Program paid the bill and service was reconnected on November 1, 1977. Thereafter, the Rimas made periodic payments on the gas bill, totaling $125.14, and by June there was a delinquency, including penalties for late payment, in the amount of $122.20. This was paid by the Emergency Energy Program on June 8, 1978. On July 10, 1978, the Rimas had paid their bill in advance and had a $23.95 credit. Thereafter, they made periodic payments, and on April 5, 1979, there was a delinquency of $64.02. There is no other

evidence of failure to pay bills on time. This was the situation at the time of trial.

The second agreement required the Rimas to purchase food stamps monthly. The evidence indicated that during 1977 and 1978 they purchased food stamps on only one occasion.

The substance of the evidence with reference to meal planning and preparation and housekeeping was this. Shiela demonstrated to the social worker that she was able to plan a meal properly. The worker, however, never saw her prepare a nutritious meal and concluded that she did not because the necessary supplies were not in the house on the occasions of her visits. The evidence was that the home was clean 9 out of 10 times. However, the children's room was empty and dirty as the Rimas had disposed of the bed and other furnishings, apparently to get funds to aid their existence.

Margaret's foster mother testified that she received Margaret in her home on May 24, 1976. It may be noted that this was the day before the original petition was filed in the county court. Margaret was 3 years 3 months of age at that time. She was a thin child and did not appear healthy. Margaret was acquainted with the foster parents' only daughter, who was afflicted with cerebral palsy, because both were enrolled in the CDC at McCook. Margaret treated the daughter kindly. Margaret continued in the CDC program until the January preceding the witness' testimony, at which time the foster parents were advised that she needed to be with more normal children. Thereafter, Margaret went to CDC 3 days a week and preschool 2 days a week. The foster parents wish to adopt Margaret.

The foster mother of Mary, the assistant director of the CDC program at Cozad, received the child on January 4, 1977, when she was 2 years 3 months old (after having been in other foster care for 7 months); she was not toilet trained. She was always loving and

never shy. She understood language and what was asked of her, but did not put words together until 1978. She was being continued in the CDC program in McCook as she still needed speech therapy. The foster parents want to adopt Mary but would accept long-term foster care.

Melody's foster mother, a social worker, received the child on April 4, 1977, about 10 months after Melody was taken from her parents. At that time she was very small, just able to sit up. In the witness' opinion, the child had poor muscle tone from the hips down. She did not crawl. The special care being given her by the foster parents was to work along with the professionals. The foster mother considered that she had speech problems. She was unable to crawl on all fours, but pulled herself along with her arms and legs. The foster parents want very much to adopt Melody but would accept long-term foster care, and they are willing to accept almost anything rather than give her up. The witness was also permitted to testify without objection to certain hearsay testimony about the child's alleged small head size. She testified that the doctors "theorized" that it had been the consequence of malnutrition and that she had outgrown it. She had been tested and was "genetically normal."

There are a large number of irregularities, and procedural and substantive errors, appearing in the record which, if tolerated or approved by this court, would tend, if followed in every case, to make a petition for termination of parental rights a self-fulfilling prophecy.

We list these in somewhat chronological order and in an abbreviated form before we discuss such of them as we find necessary. (1) The evidence indicates that the children were removed from the home before the petition was filed, and the record, which apparently is supposed to be complete, does not indicate that the procedures for emergency removal provided by Neb. Rev. Stat. § 43-206(5) (Reissue

1978) were followed; (2) The execution of a stipulation by the allegedly mentally retarded parents placing the custody of the children in the Department of Public Welfare; (3) The affidavit of the director of the M-CSSU attached to the original petition, which, it is to be inferred, was the foundation for the removal, states at least one important alleged fact which the later record establishes is false, i.e., that Melody's weight at 3 months was less than her birth weight; (4) The delay of more than 1 year in holding the adjudication hearing, during a substantial portion of which time both the allegedly retarded parents and the children were without representation by guardian ad litem or counsel; (5) A substantial portion of the important and relevant evidence adduced and admitted at the adjudication hearing was either hearsay or admitted without appropriate foundation, contrary to the statutory requirement that the usual rules of evidence apply, Neb. Rev. Stat. § 43-206.03 (Reissue 1978); (6) The fact that the adjudication order and finding were based upon a stipulation between the State and the guardians ad litem rather than evidence, contrary to legal precedents which provide that, although such guardians may enter into stipulations which merely facilitate the procedure, they have no right to waive or stipulate away the substantive rights of their wards (see authorities later cited in the discussion); and (7) The legal and evidentiary disparity which exists between the basis of the adjudication and the requirement of subsection (6) of § 43-209 which provides that termination must be based upon failure to correct conditions leading to the determination of neglect at the adjudication.

Mental deficiency is not a legal term but, rather, a fact question. It includes those situations where there is a substantial impairment of the will. 44 C.J.S. *Insane Persons* § 2 (1945). Section 43-209 requires that where termination of parental rights is sought because of mental deficiency of the parents, a

guardian ad litem be appointed. The delay in the appointment of a guardian ad litem for the parents and the children and the long delay in holding the adjudication hearing do, in our judgment, constitute a lack of due process in that it deprived the parents of their parental rights under the "liberty" provision of Neb. Const. art. 1, § 3. It also may have constituted a lack of due process as far as the children are concerned, for they are entitled to the care of their natural parents and association with their siblings.

The statutes do contemplate that children may be removed from parental care immediately on the filing of the petition where the welfare of the child requires immediate action. Neb. Rev. Stat. §§ 43-206(5) and 43-205.01(3) (Reissue 1978). The record does not establish that these statutes were complied with.

Nonetheless, these procedural and substantive errors cannot be remedied by mere reversal and dismissal, for we must, of course, consider the welfare of the children. The allegations and indications in the record indicate they may have been neglected in ways other than that on which the adjudication was based, and further remedial measures or even termination of parental rights may be necessary.

As we have noted, the adjudication, based upon the proposition that the children needed special care because of their mental condition, was entered pursuant to a stipulation by the guardians ad litem and the State. The mental condition referred to in § 43-202(2)(d), read in the context of the various other grounds for invoking the jurisdiction of the court, we believe, refers to some inherent mental condition. It cannot be said that there is any competent evidence to support the finding that the children suffered from any special mental condition or that the parents refused or neglected to provide that special care. Margaret, at the time of her removal from the home, was then in attendance at the CDC. The evidence was that, even if foster care was to be

continued, Margaret's participation in the CDC program should continue. The sole evidence with reference to Margaret's mental condition was the hearsay statement of one physician that there was some indication that she was mentally retarded, but that it was hard to say at her age. There is not one scintilla of evidence that either Mary or Melody suffered from such a mental condition. Later evidence adduced at the termination hearing tends to completely rebut the proposition that they suffered from some mental condition which required special care. Rather, it tended to show that they were normal children.

A guardian ad litem may not waive the substantive rights of the ward, but must require proper legal proof. *First Trust Co. v. Hammond*, 139 Neb. 546, 298 N.W. 144 (1941); *In re Estate of Manning*, 85 Neb. 60, 122 N.W. 711 (1909); *Wirth v. Weigand*, 85 Neb. 115, 122 N.W. 714 (1909); *Mattson v. Mattson*, 29 Wash. 417, 69 P. 1087 (1902); *Knight v. Waggoner*, 214 S.W. 690 (Tex. Civ. App. 1919); *Cochran v. Cochran*, 277 Ill. 244, 115 N.E. 142 (1917); *Peterson v. Hague*, 51 Idaho 175, 4 P.2d 350 (1931); *In re Houts*, 7 Wash. App. 476, 499 P.2d 1276 (1972). It should be apparent that adjudications cannot be effectively reviewed if based upon stipulations rather than upon evidence. This, based upon the reasoning of the cited authorities, is at least part of the reason why a guardian ad litem may not waive substantive rights in the cases of incompetent or mentally deficient persons, for to do so would prevent effective judicial review. We hold that the finding based upon the stipulation was void.

As we have earlier noted, these proceedings were initiated upon the ground that the parents, because of their mental deficiencies, were unable to discharge their parental responsibilities and that such condition, in reasonable likelihood, would continue for a long and indefinite period of time. That ground was abandoned and the stipulation was entered into. The record supports the inference that there existed a desire to

avoid making a finding that the parents were incompetent or mentally deficient, for this, especially in the case of Shiela, might indicate that she is incapable of exercising her will in defense of her own right of privacy. The record shows without contradiction that, sometime, apparently between the time the petition was filed and before the adjudication hearing, the director of the M-CSSU assisted in the processing of legal instruments executed by the allegedly mentally deficient parents to authorize Shiela to have an abortion and for Shiela to be sterilized. The abortion did take place. The director testified that the sterilization did not. However, there is other evidence in the record that it may have taken place. At what time and on whose initiative does not appear. The director testified that Shiela understood what she was signing.

We have searched the statutes to determine whether any welfare agency in Nebraska is authorized to engage in such activities. We find none. The Supreme Court of the United States has held that a woman does have a constitutional right to an abortion. It would seem to follow that a woman also has a concomitant right not to have the above-described procedures performed. See the opinion of Mr. Justice Douglas in *Skinner v. Oklahoma*, 316 U.S. 535, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942), and the several concurring opinions in that case.

It is plain from the wording of the statute that if parental rights are terminated under subsection (6) of § 43-209 because reasonable efforts have failed to correct the condition, the efforts, or in this case the implementation of the "agreements," must be directed to correcting the condition leading to adjudication in the first place, i.e., in this instance, a finding that the children suffered from a mental condition which required parental care which the parents refused or neglected to give.

The record, however, does tend to support two con-

clusions: (1) That the children may have been malnourished; and (2) That their slow development in other areas was because the parents may not have provided the necessary environment to develop them at a normal rate in the intellectual and social areas. The adjudication was not based on those grounds, as would be required by statute. The plans were not designed to remedy the conditions determined by the adjudication. Two of the social workers testified that little instruction or encouragement could be given to the parents to provide the necessary stimulation when the children were not present in the home. We hold that the trial court erred in determining that the mental deficiency of the parents was not relative to the court's determination of whether to terminate parental rights.

We reverse the judgment and remand the cause to the county court with directions to receive evidence to determine whether there should be an adjudication of neglect and whether parental rights should be terminated under subsection (5) of § 43-209, and receive such other evidence as it may determine is necessary and relevant, especially as to conditions as they exist at the present time. Leave is granted to amend pleadings as may be required in the judgment of the county court. The court should also determine whether, pending final determination of the cause, greater visitation rights under conditions more convenient to the parents should be granted.

We urge the county court to give reasonable priority to this matter.

REVERSED AND REMANDED WITH DIRECTIONS.

BRODKEY, J., concurs in result.