IN RE INTEREST OF JEREMY JENKINS, A MINOR UNDER THE AGE OF 18 YEARS. STATE OF NEBRASKA, APPELLEE, V. WENDY JENKINS, APPELLANT, IMPLEADED WITH ROBERT H. JENKINS, JR., APPELLEE.

252 N. W. 2d 280

Filed April 13, 1977. No. 40863.

Gary B. Thompson, for appellant.

Charles W. Balsiger, for appellee State.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, MC-COWN, CLINTON, BRODKEY, and WHITE, JJ.

McCOWN, J.

This is a proceeding to declare an infant a neglected and dependent child, and to terminate parental rights. The county court of Gage County found the child to be a neglected child as defined under section 43-202(2), R. S. Supp., 1976, terminated all parental rights, and placed the infant in the temporary custody of the Gage County department of public welfare until the child could be delivered to the Nebraska Children's Home Society to be placed for adoption. The parents appealed to the District Court. The District Court affirmed the judgment of the county court. The mother of the child has appealed to this court.

Robert and Wendy Jenkins are the parents of Jeremy Jenkins, who was born December 25, 1974. Robert was 18 and Wendy was 19 years old when the baby was born. Jeremy was their first child and was a normal, healthy baby at birth. In March 1975, Robert Jenkins joined the military service and left his wife and son in an apartment in Beatrice, Nebraska. In June 1975, Robert returned to Beatrice on leave before departure for overseas duty. Before he left he helped Wendy move out of the apartment she and the baby had occupied. When they left the apartment was filthy. Garbage and milk cartons

were piled up to the windowsills. Used diapers were piled in a corner. The place was infested with bugs, and the toilet was clogged with dried fecal material although the toilet was not out of order.

The remainder of that summer and fall Wendy and the baby primarily lived in a house in Beatrice with two girl friends of Wendy's. Wendy's house-keeping had not improved. One of the roommates, who took her furniture and moved out on November 9th, testified that the sink had been clogged since September, the toilet stool was clogged and had over-flowed, and the house was filthy. She also testified that Jeremy was left for long periods of time with wet diapers, and that he had diaper rash during all the time she lived with them.

From June through mid-September Wendy left the baby at a babysitter's home almost every day, and, on occasion, for several days at a time. On one oc-casion the babysitter had the baby for 6 days without knowing where Wendy was, nor how long she would be gone, nor where she could be reached. The baby-sitter refused to sit for Wendy after mid-September 1975, because she had not been paid. On one occa-sion in August, Jeremy's paternal grandmother re-moved him from the babysitter's home because she was not satisfied with his care. She arranged a dis-cussion with Wendy and Wendy's parents to attempt to obtain better care for the child.

In the summer of 1975, Wendy worked as a wait-ress and cook at a drive-in restaurant on the north edge of Beatrice. On one occasion on a hot day in July, Wendy left Jeremy alone in a car in the park-ing area for a substantial part of the afternoon. Three witnesses verified the incident, although their time estimates varied from 1½ hours to 5 hours, and they disagreed as to which window was open, if any.

During the fall of 1975, Wendy and Jeremy spent considerable time at the house of a male friend of Wendy's in Barneston, Nebraska. Their visits

sometimes lasted for days at a time. On one occasion in November, Wendy left Jeremy alone in the house in Barneston in a "baby-proofed" bedroom while she went to another town with some friends. The parents of her Barneston friend learned that Jeremy was in the house alone, went to the house at 11 p.m., and took him to their home for the rest of the night. When they returned the baby to the Barneston house the next day at noon, Wendy did not know Jeremy had been gone.

On December 3, 1975, this proceeding was filed and the county court ordered immediate removal of Jeremy and placed temporary custody in the Gage County department of public welfare pending hearing. Two Beatrice police officers and a county welfare worker went to Wendy's Beatrice house and took custody of Jeremy. Their testimony and pictures establish that the house was as filthy as before. The house had been without most of its furniture since November 9th, and a mattress on the floor was the only bed.

Jeremy was taken to the hospital and examined by Dr. Stratton. The examination showed a small burn on Jeremy's right cheek which looked as if it might have been made by a cigarette; a bruise at least 4 days old on his left cheek; four circular burns or puncture wounds on the palm of his right hand; three vertical burns or abrasions on the wrist of his left hand; a cross-hatch burn about 7 days old on his lower right leg that looked as if he might have come into contact with a floor furnace grate; and a floor burn on his left knee. He had a slight case of diaper rash. X-ray examination showed a severe trauma about 4 weeks old to his lower left leg with indications of bleeding under the lining of the bone. The injury could not have occurred from the normal activities of an 11-month-old child but would have had to be caused by falling or being grasped or struck in some manner.

The doctor also testified that Jeremy's height and weight at birth were normal; that at 6 months his weight gain and growth were inappropriately low; that at 11 months, Jeremy's growth pattern was still low; and that he was a small infant for his age. In the 1 month after he was placed in the foster home, there was a substantial change and improvement both in weight and height. In the doctor's opinion the sudden change in the growth pattern was due to the changed environment.

Wendy testified that she had made mistakes in taking care of Jeremy but that she loved him and wanted him back. Robert, who was home on special leave for the hearing, testified that he would take Jeremy and see what arrangements he could make, or he might put Jeremy up for adoption.

The county court determined that Jeremy's best interests dictated that the parental rights of both parents should be terminated and Jeremy placed in the custody of the department of welfare, to be placed for adoption. The District Court affirmed the judgment of the county court and the mother has appealed to this court.

The appellant contends that the evidence is insufficient to establish that she was unfit to have custody of her child. She argues that there is no affirmative evidence of child abuse, nor lack of proper feeding, nor of any other conduct on her part which would justify the termination of her parental rights.

Section 43-202(2), R. S. Supp., 1976, grants jurisdiction to declare a child neglected or dependent within the meaning of the section: "(b) who lacks proper parental care by reason of the fault or habits of his parent, guardian, or custodian; (c) whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such child; * * * or (e) who is in a situation or en-

gages in an occupation dangerous to life or limb or injurious to the health or morals of such child.''

Section 43-209, R. S. Supp., 1976, provides that the court may terminate all parental rights between the parents and such child when the court finds such action to be in the best interests of the child and it appears from the evidence that one or more of the following conditions exist: ''(2) The parents have substantially and continuously or repeatedly neglected the child and refused to give the child necessary parental care and protection; * * *.''

The county court found Jeremy to be a child as described in section 43-202(2), R. S. Supp., 1976, and found that the parents had substantially and repeatedly neglected the child and had refused to give him the necessary parental care and protection. The District Court confirmed that finding and judgment.

While the natural and superior rights of parents to have the custody of their children has always been protected and maintained by the courts, those rights are not inalienable. The public also has a paramount interest in the protection of the rights of children. See State v. Tibbs, 197 Neb. 236, 248 N. W. 2d 330. This court has consistently held that in a proper case the court may terminate all parental rights of parents when the court finds such action to be in the best interests of the child and it appears from the evidence that the parent or parents have substantially and continuously or repeatedly neglected the child and refused to give the child necessary parental care and protection. State v. Johnson, 196 Neb. 795, 246 N. W. 2d 591.

In cases involving custody of neglected or dependent children and the termination of parental rights in juvenile court, the findings of the trial court will not be disturbed on appeal unless they are against the weight of the evidence. The judgment of the trial court will be upheld on appeal unless there is an

abuse of discretion. See State v. Johnson, *supra.* Those rules are followed by this court even though an appeal of such a case in this court is heard de novo on the record.

In this case, while there may be no direct affirmative evidence of child abuse, there is ample evidence of neglect and a lack of proper parental care directly and adversely injurious to the health, safety, and well-being of the child. Parental rights may be forfeited by substantial, continuous, and repeated neglect of a child and a failure to discharge the duties of parental care and protection. In such a case, the best interests of the child become paramount.

The judgment of the District Court was correct and is affirmed.

AFFIRMED.