682 N.W.2d 238 (2004)
268 Neb. 239
In re GUARDIANSHIP OF D.J., a minor.
Carla R., appellant,
v.
Tim H. and Sherry H., Guardians, and Tory J., appellees.
No. S-02-129.
Supreme Court of Nebraska.
July 2, 2004.
*241 Sally A. Rasmussen, of Knudsen, Berkheimer, Richardson & Endacott, L.L.P., Lincoln, for appellant.
P. Stephen Potter, P.C., Gothenburg, and Jeffrey M. Eastman, Ogallala, for appellees Tim H. and Sherry H.
Michael E. Piccolo, of Dawson & Piccolo, North Platte, for appellee Tory J.
HENDRY, C.J., and WRIGHT, CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.
GERRARD, J.
At a time of financial and emotional difficulties, the appellant, Carla R., asked her parents to care for her biological child. Thereafter, Carla signed a petition for her parents to be appointed guardians for her child. The county court ordered the guardianship. Three years later, having achieved financial security and emotional well-being, Carla sought to regain custody of her child. Finding that Carla had forfeited her parental rights and that the best interests of her child would be served by continuing the guardianship, the county court denied her petition to terminate the guardianship. Carla appeals, and for the reasons that follow, we reverse, and remand with directions.

FACTUAL AND PROCEDURAL BACKGROUND
On July 25, 1992, Carla and Tory J. were married. On June 7, 1993, their child, D.J., was born. Thereafter, Carla and Tory's marriage began to deteriorate, and Tory moved out of their home in 1996. At that time, Carla lived in her own home in Max, Nebraska, but spent much of her time with her parents, Tim H. and Sherry H. (collectively the grandparents), who also lived in Max. Carla worked full time, and, since shortly after D.J.'s birth, most of D.J.'s time was spent with the grandparents.
In July 1997, Carla moved to Lincoln, Nebraska, in search of work. Believing she could not properly care for D.J., and suffering emotionally from the separation with Tory, Carla left D.J. in the care of the grandparents. Carla testified that during her time in Lincoln, she maintained consistent contact with D.J. through monthly visits, telephone calls, and letters and gifts sent via the mail. However, the grandparents dispute the existence of much of this contact.
On June 8, 1998, Carla and Tory filed a petition for appointment of a guardian for D.J. The petition nominated the grandparents to serve as the guardians for D.J. In addition, both Tory and Carla filed corresponding affidavits in support of appointing the grandparents as guardians. On July 7, the grandparents accepted the appointment, and on July 13, the county court filed its order appointing the grandparents as guardians.
Carla testified that prior to filing the petition for guardianship, she consulted a lawyer to discuss her pending divorce action. Carla testified that she informed the lawyer that she wanted custody of D.J., but that the lawyer told her that she could not have custody because D.J. was not living with her at the time. According to Carla, the lawyer then gave her a document, purportedly the petition to establish a guardianship over D.J., for her signature. Carla testified that her mother, who was present at this meeting, told her the purpose of the document was to preclude Tory from taking D.J. in the middle of the night. Carla signed the petition and an affidavit which was notarized by her mother.
According to Carla, the lawyer failed to explain the ramifications of establishing a *242 guardianship and advised her about "the ease" with which a guardianship could be terminated. Carla also testified that the lawyer was representing the grandparents in their attempt to become guardians of D.J. and that the lawyer failed to tell her of this potential conflict of interest. Carla testified to these facts under oath and discussed them in her appellate brief. However, Carla's pleadings in this proceeding did not allege that the initial establishment of the guardianship was the result of undue influence or fraud. Therefore, we assume for the purposes of deciding this appeal that the guardianship was properly ordered in the first instance.
While in Lincoln, Carla began to abuse alcohol and drugs. In an attempt to solve her substance abuse problem, Carla left Lincoln and moved back into her parents home in January 1999. Carla stayed with her parent's through July, when she returned to Lincoln in search of a job. Carla testified that she attempted to take D.J. with her to Lincoln at this time; however, her parents dispute this claim. In any event, Carla testified that she traveled 240 miles to Max on numerous occasions to visit with D.J. and supplemented those visits with telephone calls and gifts.
On August 12, 2000, Carla married Brian R. At the time of trial, Carla and Brian lived in Roca, Nebraska, with Brian's daughter from his first marriage and a child born to Brian and Carla on February 17, 2001. Carla testified that she has not used illegal drugs since January 1999 and is employed as a licensed practical nurse at a rehabilitation hospital in Lincoln.
Three years after the guardianship was ordered, Carla filed a petition with the county court, pursuant to Neb.Rev.Stat. § 30-2616 (Reissue 1995), to remove the grandparents as guardians of D.J. and terminate the guardianship. In the petition, Carla alleged that she was now able to assume full care, custody, and control of D.J. and that it was in D.J.'s best interests to be reunited with her. The grandparents filed an answer to the petition which disputed these allegations.
After trial, the county court found that D.J. had thrived in the grandparents' care and that D.J. had developed a strong attachment to them. The court recognized that Carla, as the natural parent, had a superior right to the custody of D.J., but determined that she had forfeited that right by "substantial, continuous, and repeated failure to discharge her duties of parental care and protection." The court went on to conclude that it was in the best interests of D.J. to continue in the guardianship, and denied Carla's petition. Carla filed a timely appeal.

ASSIGNMENTS OF ERROR
Carla assigns, restated, that the county court erred in (1) finding that she had forfeited her parental rights to D.J., (2) failing to terminate the guardianship of D.J. and remove the grandparents as guardians, (3) admitting expert testimony without proper foundation, (4) admitting inadmissible hearsay, and (5) failing to maintain an impartial and unbiased role at trial.

STANDARD OF REVIEW
Appeals of matters arising under the Nebraska Probate Code, Neb.Rev.Stat. §§ 30-2201 through 30-2902 (Reissue 1995 & Cum.Supp.2002), are reviewed for error on the record. In re Loyal W. Sheen Family Trust, 263 Neb. 477, 640 N.W.2d 653 (2002). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. Id.

*243 ANALYSIS
Section 30-2616 states, in relevant part:
(a) Any person interested in the welfare of a ward ... may petition for removal of a guardian on the ground that removal would be in the best interest of the ward....
(b) After notice and hearing on a petition for removal ... the court may terminate the guardianship and make any further order that may be appropriate.
We begin by determining the standard of proof necessary for a biological parent to terminate the guardianship with respect to their child. Specifically, we must determine if under § 30-2616, the sole inquiry in such a termination proceeding is whether it is in the child's best interests to terminate the guardianship and reunite the child with his or her natural parent, or whether the parental preference principle establishes a rebuttable presumption that the best interests of the child are served by terminating the guardianship and reuniting the child with his or her natural parent.
The resolution of this question requires us to examine two different principles found in child custody jurisprudence. On one hand, we have stated that the paramount concern in child custody disputes is the best interests of the child. See Tremain v. Tremain, 264 Neb. 328, 646 N.W.2d 661 (2002). See, also, § 30-2616(a) ("[a]ny person interested in the welfare of a ward ... may petition for removal of a guardian on the ground that removal would be in the best interest of the ward").
On the other hand, the principle of parental preference provides that a court "may not properly deprive a biological or adoptive parent of the custody of the minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship or has forfeited that right." In re Interest of Amber G. et al., 250 Neb. 973, 982, 554 N.W.2d 142, 149 (1996). See, also, § 30-2608(a) ("[t]he father and mother are the natural guardians of their minor children and are duly entitled to their custody ... being themselves competent to transact their own business and not otherwise unsuitable").
Obviously, the parties disagree as to the proper interaction of these two principles and their application to the facts before us. Noting the tension between the two aforementioned statutes, Carla argues that the best interests analysis is always subject to the overriding consideration of a natural parent's superior rights, which, as we will discuss below, are founded in the U.S. Constitution. The grandparents dispute this assertion and argue that under § 30-2616, whether to terminate a guardianship is solely a question of the best interests of the ward.
For the following reasons, we conclude that in guardianship termination proceedings involving a biological or adoptive parent, the parental preference principle serves to establish a rebuttable presumption that the best interests of a child are served by reuniting the child with his or her parent.
We have stated that "[t]he right of a parent to maintain the custody of his or her child is a natural right subject only to the paramount interest which the public has in the protection of the rights of a child." In re Interest of Witherspoon, 208 Neb. 755, 758, 305 N.W.2d 644, 646 (1981). See, also, In re Interest of Kimsey, 208 Neb. 193, 302 N.W.2d 707 (1981). Under the parental preference principle, a parent's natural right to the custody of his or her children trumps the interest of strangers to the parent-child relationship and the *244 preferences of the child. Blecha v. Blecha, 257 Neb. 543, 599 N.W.2d 829 (1999). Stated otherwise, "in a child custody controversy between a biological or adoptive parent and one who is neither a biological nor an adoptive parent of the child involved in the controversy, a fit biological or adoptive parent has a superior right to custody of the child." In re Interest of Amber G. et al., 250 Neb. at 982, 554 N.W.2d at 149, citing Stuhr v. Stuhr, 240 Neb. 239, 481 N.W.2d 212 (1992). See, also, Nielsen v. Nielsen, 207 Neb. 141, 149, 296 N.W.2d 483, 488 (1980) ("[t]he right of a parent to the custody of his minor child is not lightly to be set aside in favor of more distant relatives or unrelated parties"). Thus, we have repeatedly held that a court may not properly deprive a parent of the custody of a minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship, or has forfeited that right. Gomez v. Savage, 254 Neb. 836, 580 N.W.2d 523 (1998). Accord, In re Interest of Amber G. et al., supra; Uhing v. Uhing, 241 Neb. 368, 488 N.W.2d 366 (1992); Stuhr, supra; Peterson v. Peterson, 224 Neb. 557, 399 N.W.2d 792 (1987); Nielsen, supra; Marcus v. Huffman, 187 Neb. 798, 194 N.W.2d 221 (1972); State ex rel. Cochrane v. Blanco, 177 Neb. 149, 128 N.W.2d 615 (1964); Ripley v. Godden, 158 Neb. 246, 63 N.W.2d 151 (1954); Norval v. Zinsmaster, 57 Neb. 158, 77 N.W. 373 (1898). See, also, In re Interest of A.C., 239 Neb. 734, 478 N.W.2d 1 (1991) (order terminating parental rights must be based upon clear and convincing evidence).
The primary justification for the parental preference principle is based upon constitutional considerations. As the U.S. Supreme Court stated in Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978):
We have little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." Smith v. Organization of Foster Families, 431 U.S. 816, 862-863 [97 S.Ct. 2094, 53 L.Ed.2d 14] (1977) (Stewart, J., concurring in judgment).
See, also, Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Shoecraft v. Catholic Social Servs. Bureau, 222 Neb. 574, 385 N.W.2d 448 (1986). Applying this principle, we have stated:
A biological or adoptive parent's superior right to custody of the parent's child is acknowledgment that parents and their children have a recognized unique and legal interest in, and a constitutionally protected right to, companionship and care as a consequence of the parent-child relationship, a relationship that, in the absence of parental unfitness or a compelling state interest, is entitled to protection from intrusion into that relationship. Hence, the parental superior right to child custody protects not only the parent's right to the companionship, care, custody, and management of his or her child, but also protects the child's reciprocal right to be raised and nurtured by a biological or adoptive parent. See Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (both parents and children in a familial relationship are protected by the U.S. Constitution). Establishment and continuance of the parent-child relationship "`is the most fundamental right a child possesses to be equated in importance with personal liberty and the most basic constitutional rights.'" Johnson v. Hunter, 447 N.W.2d 871, 876 (Minn.1989) (quoting *245 from Ruddock v. Ohls, 91 Cal.App.3d 271, 154 Cal.Rptr. 87 (1979)).
Uhing, 241 Neb. at 374-75, 488 N.W.2d at 371.
In recognizing the constitutionally protected status of the parent-child relationship, we have often said that "[w]here the custody of a minor child is involved ... the custody of the child is to be determined by the best interests of the child, with due regard for the superior rights of a fit, proper, and suitable parent." (Emphasis supplied.) Nielsen v. Nielsen, 207 Neb. 141, 149, 296 N.W.2d 483, 488 (1980). Accord, Gomez v. Savage, 254 Neb. 836, 580 N.W.2d 523 (1998); Uhing v. Uhing, 241 Neb. 368, 488 N.W.2d 366 (1992); Stuhr v. Stuhr, 240 Neb. 239, 481 N.W.2d 212 (1992); State ex rel. Cochrane v. Blanco, 177 Neb. 149, 128 N.W.2d 615 (1964); Ripley v. Godden, 158 Neb. 246, 63 N.W.2d 151 (1954); Killip v. Killip, 156 Neb. 573, 57 N.W.2d 147 (1953). Likewise, we held that the "`best interests' standard is subject to the overriding recognition that `the relationship between parent and child is constitutionally protected.'" Uhing, 241 Neb. at 373, 488 N.W.2d at 370. In other words, we have repeatedly recognized that in custody disputes between a biological or adoptive parent and a third party, the U.S. Constitution requires that the superior rights of the parent be taken into consideration.
In addition to these constitutional considerations, in custody disputes between a parent and nonparent, courts turn to the parental preference principle because the best interests standard, taken to its logical conclusion, would place the minor children of all but the "worthiest" members of society in jeopardy of a custody challenge. See Watkins v. Nelson, 163 N.J. 235, 748 A.2d 558 (2000). Cf., In re Interest of Amber G. et al., 250 Neb. 973, 554 N.W.2d 142 (1996); Uhing, supra. Moreover, by establishing a presumption in favor of parental custody, the judiciary's ability to engage in social engineering is dramatically restricted. See Watkins, supra. More than 100 years ago, this court stated:
We are aware that this court has several times asserted that in [child custody] controversies ... the order should be made with sole reference to the best interests of the child. But this has been broad language applied to special cases. The court has never deprived a parent of the custody of a child merely because on financial or other grounds a stranger might better provide. The statute declares and nature demands that the right shall be in the parent, unless the parent be affirmatively unfit. The statute does not make the judges the guardians of all the children in the state, with power to take them from their parents, so long as the latter discharge their duties to the best of their ability, and give them to strangers because such strangers may be better able to provide what is already well provided. If that were the law, it would be soon changed....
Norval v. Zinsmaster, 57 Neb. 158, 161-62, 77 N.W. 373, 374 (1898).
Therefore, unless it has been affirmatively shown that a biological or adoptive parent is unfit or has forfeited his or her right to custody, the U.S. Constitution and sound public policy protect a parent's right to custody of his or her child. While the best interests of the child remain the lodestar of child custody disputes, a parent's superior right to custody must be given its due regard, and absent its negation, a parent retains the right to custody over his or her child. The question remains, however, whether a parent's superior right should also be taken into account during guardianship termination proceedings.
*246 A guardianship is no more than a temporary custody arrangement established for the well-being of a child. See, In re Guardianship of Zyla, 251 Neb. 163, 555 N.W.2d 768 (1996) (noting temporary nature of guardianship); Dependency of A.V.D., 62 Wash.App. 562, 815 P.2d 277 (1991) (noting temporary nature of guardianship). Important here, the "appointment of a guardian is not a de facto termination of parental rights, which results in a final and complete severance of the child from the parent and removes the entire bundle of parental rights." In re Guardianship of Zyla, 251 Neb. at 166, 555 N.W.2d at 771. See, also, In re Interest of Amber G. et al., supra. Rather, guardianships give parents an opportunity to temporarily relieve themselves of the burdens involved in raising a child, thereby enabling parents to take those steps necessary to better their situation so they can resume custody of their child in the future. See Dependency of A.V.D., supra.
The policy behind this rule is straightforward: guardianships are intended to encourage parents experiencing difficulties to temporarily turn over the custody and care of their childrensafe in the knowledge that they will be able to regain custody in the future. This policy would be frustrated if guardianships were permanent or resulted in the automatic termination of parental rights, because parents would be less likely to voluntarily petition for a guardian to be appointed to care for their minor children. Therefore, children would unnecessarily be placed in jeopardy in many circumstances.
Furthermore, because a guardianship is temporary and does not terminate parental rights, we conclude that the constitutional concerns which serve as the justification for the parental preference principle in other situations also apply to parent's seeking to regain custody by terminating the guardianship with respect to their children. Absent circumstances which terminate a parents constitutionally protected right to care for his or her child, due regard for that right requires that a biological or adoptive parent be presumptively regarded as the proper guardian for his or her child.
Thus, we hold that in guardianship termination proceedings involving a biological or adoptive parent, the parental preference principle serves to establish a rebuttable presumption that the best interests of the child are served by reuniting the minor child with his or her parent. In other words, an individual who opposes the termination of a guardianship bears the burden of proving by clear and convincing evidence that the biological or adoptive parent is either unfit or has forfeited his or her right to custody. Absent such proof, the constitutional dimensions of the relationship between parent and child require termination of the guardianship and reunification with the parent.
As discussed above, the appointment of a guardian did not terminate Carla's parental rights to D.J. Therefore, unless it was affirmatively proved by clear and convincing evidence that Carla was either unfit or forfeited her right to D.J., the guardianship over D J. should have been terminated and Carla's custody of D.J. restored.
In denying Carla's petition to terminate the guardianship, the court did not find Carla to be an unfit parent. Because the appellees did not assign this as error by way of cross-appeal, Carla's fitness as a parent is not at issue. However, the court did find that Carla had forfeited her superior right to custody of D.J. by "substantial, continuous, and repeated failure to discharge her duties of parental care and protection." The court, however, did not *247 state the factual basis for this determination.
Our review for error on the record leads us to conclude that the county court's finding of forfeiture is not supported by competent, clear, and convincing evidence. In the past, we have stated that "[p]arental rights may be forfeited by substantial, continuous, and repeated neglect of a child and a failure to discharge the duties of parental care and protection." (Emphasis supplied.) State v. Jenkins, 198 Neb. 311, 317, 252 N.W.2d 280, 284 (1977). Accord, In re Interest of Witherspoon, 208 Neb. 755, 305 N.W.2d 644 (1981); In re Interest of Kimsey, 208 Neb. 193, 302 N.W.2d 707 (1981).
Essentially, the grandparents argue that the evidence establishes that Carla forfeited her rights to D.J. by failing to take an active part in D.J.'s life. Specifically, the grandparents argue that Carla forfeited her right to D.J. by, inter alia, (1) failing to attend D.J.'s parent-teacher conferences; (2) failing to contact D.J.'s schoolteachers to check D.J.'s progress; (3) failing to attend a variety of school activities; (4) failing to supply the grandparents with financial support for D.J.'s care; (5) failing to attend church with D.J.; (6) failing to attend D.J.'s summer activities, including swimming lessons, Bible school programs, and T-ball games; (7) failing to visit D.J.; and (8) failing to show an appropriate amount of interest in D.J.
We disagree. While it is true that Carla missed a variety of activities that one would normally associate with parenting, this is a natural consequence of the establishment of a guardianship. As noted above, guardianships are designed to temporarily relieve parents of the rigors of raising a child. Those appointed as guardians are aware that they become the caretakers of the child during their appointment. In essence, the grandparents ask us to find that parents who have been temporarily relieved of their parenting duties, through the appointment of a guardian, are guilty of failing to do the very duties of which they were expressly relieved. This we will not do. Such a rule would provide a powerful disincentive for parents to come forward and request help during their time of need, defeating the very purpose of guardianships.
Thus, the nature of a guardianship makes it particularly inappropriate in this context to establish the forfeiture of parental rights by solely focusing on a parent's failure to "discharge the duties of parental care and protection." Jenkins, 198 Neb. at 317, 252 N.W.2d at 284. There must also be clear and convincing evidence of "substantial, continuous, and repeated neglect of a child." Id. See, also, Gray v. Hartman, 181 Neb. 590, 596, 150 N.W.2d 120, 123 (1967) ("forfeiture of parental rights may be effected by the indifference of a parent for a child's welfare over a long period of time"); Raymond v. Cotner, 175 Neb. 158, 163, 120 N.W.2d 892, 895 (1963) (forfeiture established by parent's "complete indifference" to child's welfare), overruled on other grounds, Bigley v. Tibbs, 193 Neb. 4, 225 N.W.2d 27 (1975).
Here, the record does not establish Carla's neglect or complete indifference toward D.J. Instead, the evidence shows that Carla adequately provided for D.J.'s care by placing D.J. in the capable and loving hands of her parents. Moreover, Carla made substantial and repeated efforts to maintain a relationship with D.J. throughout the guardianship. For example, the record shows that Carla helped care for D.J. when she returned from Lincoln in January 1999 until her departure in July 1999. In addition, despite living in Lincoln, Carla managed to regularly visit D.J. At trial, Carla testified that she saw D.J. 64 times from July 1999 until July *248 2000 and 74 times from July 2000 until July 2001. In fact, Carla testified that the longest period she went without physical contact with D.J. was for 1 month during which she was not allowed to travel due to complications stemming from her pregnancy. Moreover, Carla supplemented these personal visits with frequent telephone calls, letters, and gifts.
The evidence also demonstrates that Carla maintained a high level of interest in D.J. For example, she attended D.J.'s kindergarten graduation, baptism, and Christmas program. In addition, two of D.J.'s teachers testified that Carla came to school a few times to eat lunch with D.J. and that D.J. brought Carla and Brian's daughter to school for show and tell. Carla also demonstrated her knowledge of D.J.'s interests and activities. In sum, the courts finding of parental forfeiture is not supported by the evidence.
This in no way diminishes the substantial role that is undertaken by guardians on behalf of wards for significant periods of time. The grandparents are to be commended for stepping in on behalf of Carla and caring for D.J. at a crucial time in D.J.'s life. Nonetheless, the evidence adduced at trial, when considered in light of the sound policy behind the parental preference principle in guardianship situations, leads us to conclude that the judgment of the county court must be reversed.
Having concluded that Carla's first and second assignments of error have merit and are dispositive of this appeal, we need not consider her remaining assignments of error. See Mooney v. Gordon Mem. Hosp. Dist., 268 Neb. 273, 682 N.W.2d 253 (2004).

CONCLUSION
The county court erred in finding that Carla had forfeited her right to parent D.J. and in failing to terminate the guardianship. The judgment of the court is reversed, and the cause is remanded to the county court with directions to remove the grandparents as guardians, to terminate the guardianship, and to reinstate in Carla the care, custody, and control of her minor child, D.J.
REVERSED AND REMANDED WITH DIRECTIONS.
STEPHAN, J., not participating.