IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

IN RE GUARDIANSHIP OF CONNER J.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE GUARDIANSHIP OF CONNER J., A CHILD UNDER 18 YEARS OF AGE.

NEBRASKA DEPARTMENT OF HEALTH AND HUMAN SERVICES, APPELLEE,

V.

THERESIA J., APPELLANT.

Filed June 10, 2025.    No. A-24-676.

Appeal from the County Court for Madison County: MICHAEL L. LONG, Judge. Affirmed.

Jason S. Doele, of Stratton, DeLay, Doele, Carlson, Buettner & Stover, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, Deanna M. Pina, Special Assistant Attorney General, and Jason M. Lammli, guardian ad litem, for appellee.

RIEDMANN, Chief Judge, and MOORE and ARTERBURN, Judges.

MOORE, Judge.

### INTRODUCTION

Theresia J. (hereinafter referred to by her middle, and preferred, name "Elaine") was appointed guardian for the minor child, Conner J., through a probate action. The county court for Madison County, sitting as a juvenile court, ultimately terminated the guardianship, and Elaine appeals that decision. For the reasons set forth herein, we affirm.

### STATEMENT OF FACTS

Elaine is the maternal grandmother of Conner, who was born in March 2010. Conner's mother placed Conner into Elaine's care when he was 2 years old and maintained weekly contact with him. In September 2015, Elaine petitioned to establish guardianship of Conner and the

- 1 -

Madison County Court subsequently appointed Elaine permanent guardian of Conner in October 2015.

In March 2022, the State filed a petition alleging that Conner was a juvenile under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because Conner suffered from mental health conditions which had caused a variety of extreme, violent, and aggressive behaviors at school and home. The petition also alleged that though Elaine had obtained some treatment for Conner, she had limited the information shared among services providers and Conner's school, preventing Conner from having the most effective treatment. Additionally, Elaine allegedly stopped complying with the recommendations of a voluntary case plan intended to address Conner's behaviors. In May, the county court, sitting as a juvenile court, adjudicated Conner as a juvenile under § 43-247(3)(a). Conner remained in Elaine's home at this time.

In the summer of 2022, Conner began expressing extreme violence (including hitting and kicking Elaine), resulting in two attempted and two successful hospitalizations of Conner. In late June, Elaine contacted the family's caseworker to say that she could not control Conner's aggressive behaviors and that he could no longer live in her home. Conner was removed from Elaine's home in July and placed into the physical custody of the Nebraska Department of Health and Human Services (the Department). He began living in foster care at this time.

In August 2022, the Department filed an ex parte motion to suspend visitation between Conner and Elaine. The motion referenced attached affidavits in support of the motion authored by Conner's psychiatrist and the family's caseworker at the time. However, the affidavits are not included in our record on appeal. An order entered by the juvenile court in November 2022 suspended visitation until further order of the court. In July 2023, Elaine filed a motion requesting therapeutic visitation between herself and Conner. Elaine's motion was subsequently granted by the court and contact between Conner and Elaine resumed. An order following a review hearing held in January 2024 referred to the Department providing "supervised visitation[.]"

On March 5, 2024, the Department filed a motion to terminate the probate guardianship. The Department alleged that little to no progress toward Elaine's reunification with Conner had been made, and that terminating the guardianship will allow Conner to obtain permanency through the juvenile court case and is in Conner's best interest.

A hearing before the juvenile court was held on August 9, 2024. The following evidence was adduced.

Dr. Ryan Edwards, a licensed child adolescent psychiatrist, first evaluated Conner in May 2019 and assumed full mental health care of Conner in December 2021. In 2019, Edwards diagnosed Conner with attention-deficit/hyperactivity disorder (ADHD), unspecified trauma and stressor-related disorder (concerns for physical abuse, sexual abuse, and neglect between the ages of 12 and 18 months), and nocturnal enuresis (nighttime bed-wetting). In 2021, Edwards added the diagnoses of severe oppositional defiant disorder and unspecified pervasive developmental disorder. Elaine obtained an assessment through Boys Town in March 2022 that diagnosed Conner with autism spectrum disorder. Conner's most recent psychiatric evaluation with Edwards occurred in June 2024. At that time, Conner's diagnoses included autism spectrum disorder with accompanying intellectual impairments, intellectual disability, ADHD, unspecified impulse control disorder, and unspecified trauma and stressor-related disorder. Though Edwards himself

had not diagnosed Conner with autism, Edwards agreed with the diagnoses based on his own interactions with Conner.

Edwards stated that Conner's autism spectrum disorder creates a limited social reciprocity, wherein Conner does not have the fluid ability to instantly communicate with other people. Conner's deficit of social reciprocity, when combined with an intellectual disability, limits his ability to understand, and causes him to learn below that of a normally developing child. Therefore, Conner requires more specialized supports, time, and patience, in both the home and academic environments. Due to the severity of Conner's autism, he will likely require continued support for his daily activities indefinitely.

Edwards testified that Elaine distrusted the accuracy of Conner's autism diagnosis. Elaine testified that she arranged for Conner to take an autism evaluation because she felt there "was a need for him to get some services." Elaine initially had a hard time accepting the diagnosis, primarily because the evaluation lasted only 20 minutes, leading Elaine to doubt its validity. At the time of trial, Elaine stated that she had come to accept Conner's autism diagnosis and was not challenging the diagnosis. Elaine noted that Conner also displays the symptoms of social pragmatic communication disorder, and she has been reading about that disorder in comparison with autism.

According to Edwards, Conner's ADHD and impulse control disorder make it difficult for Conner to control his impulses, from general restlessness and fidgeting to complete dysregulation. Conner's behavioral issues were first documented in 2017. Conner's limited impulse control, combined with his oppositional behaviors, have led Conner to engage in dangerous behaviors such as pulling fire alarms and putting his hands in electrical sockets. Reports from Conner's middle school prior to his removal included that he had bitten a teacher to the point of broken skin, urinated on the floor, wiped feces on the bathroom stalls, exposed himself, and attempted to grab a teacher by her breasts and vagina. Safety concerns documented in visitation notes during the juvenile case included Conner repeatedly attempting to run into the street, throwing sticks at the visitation worker, and once putting his hands around Elaine's neck in an attempt to strangle her.

Edwards detailed a power dynamic between Elaine and Conner, whereby when Elaine would try to manage Conner's behaviors, Conner would typically escalate with increasingly problematic behavior in an effort to control the situation. Conner's escalation would continue to the point where there were significant safety concerns. The escalations would typically happen during school breaks, leading Edwards to believe that either the amount of behavioral therapy and supports were not sufficient, or that there was a breakdown between the therapeutic recommendations and the application of the recommendations within the home. Though Elaine was "very well connected" to Conner, Edwards had "long-lasting and substantial concerns" about Elaine's mistrust of the public school system and other providers, which Edwards believed potentially interfered in Conner's ability to improve.

Edwards had seen Conner's trauma and stressor-related disorder manifest as overemotional reactivity when he was confronted with difficult transitions or anything which reminded Conner of an unstable living situation. Therefore, Conner requires significant structural support and highly consistent behavior plans. Edwards noted that Conner had a "complicated diagnosis picture." Edwards opined that to maintain the progress, Conner would need a caregiver who has consistent structural supports in the home and adheres to a comprehensive behavioral plan that is directed by

an experienced behavioral therapist, as well as fluid and effective communication between the home and school.

In the year prior to trial, Conner's problematic and potentially dangerous behaviors had improved to the point where Conner had been able to cease taking medications designed to treat aggression and irritability. This substantial improvement occurred while Conner was in foster care.

Amber Wiest, a licensed independent mental health practitioner, began treating Conner in May 2022. Conner sees Wiest twice a week for individual therapy and his initial treatment goals were to improve family relationships, improve academic performance, and follow a safety plan. At the time of trial, Wiest has seen changes in Conner's behavior, such as his ability to articulate when he feels anxious, though Conner continues to struggle with boundary issues.

After Conner's individual therapy sessions, Wiest had brief follow-ups with Elaine when Wiest explained the manifestations of Conner's autism and how Elaine could better support Conner's needs. Elaine would respond that she did not want to work on Wiest's suggestions as Conner was not autistic. Wiest was concerned by Elaine's resistance to understanding Conner and his mental health and behavioral needs.

Wiest was also supposed to provide family therapy to Conner and Elaine, but at every session Elaine would say that she was there for visitation and not for family therapy. Wiest acknowledged that the juvenile court order did refer to "therapeutic visitation" and that the language of the order was confusing. Wiest clarified to Elaine that as a mental health therapist, she was there to facilitate family therapy, whereas visitations are interactions with Conner supervised by a visitation worker. Wiest also articulated the reasons why it was important to have family therapy if the goal of the juvenile case was to reunify Elaine and Conner. Despite the clarifications, Elaine continued to reject family therapy, saying that she did not need family therapy and would only participate in visits.

Though Conner wanted to participate in family therapy, none occurred due to Elaine's refusals. After family therapy with Wiest was unsuccessful, the Department agreed to suspend family therapy rather than seek out an alternative therapist. The Department believed that attempting family therapy again could complicate Conner's therapeutic progress.

Wiest has observed that Conner desires a good relationship with Elaine, but his history with Elaine has been traumatizing to him. Though Conner wants to see Elaine, Elaine's actions are not consistent with what Conner knows is supposed to be happening (such as her refusal to participate in court-ordered family therapy), which is anxiety provoking and hurtful to him. Wiest believed that Elaine makes decisions according to her agenda as opposed to the best interests of Conner.

Wiest testified that Conner needs a caregiver who is consistent and predictable. Conner needs to know that he is going to be safe and in an environment with which he is familiar. Further, he needs to trust the intentions of the caregiver. Wiest is concerned that in an uncontrolled, unsupervised environment, Conner will become progressively aggressive, creating global safety concerns. Wiest noted that Conner's needs are currently being met in his foster home.

Kimberly Kalina, a provisionally licensed mental health practitioner, has been Elaine's individual therapist since May 2023. Kalina denied that Elaine was resistant to family therapy, as Elaine had requested that Kalina or a neutral third party provide family therapy. Kalina testified that Elaine was under the impression that because the court order referred to "therapeutic

visitation," the order was for visitation and not family therapy. There was some testimony that Wiest and Kalina had communicated about coordinating care for the family.

In individual therapy, Elaine was working with Kalina in three specific areas: building a more trusting relationship with the case professionals, learning more about and being accepting of Conner's mental health and autism diagnoses, and processing the grief and loss associated with Conner's removal from her care. Kalina has seen significant progress in all three areas, particularly in the area of Conner's autism. Elaine finally accepted Conner's autism diagnosis in early 2024, and has learned more about autism through self-education, reaching out to autism nonprofit organizations, and discussing literature resources with Kalina. Throughout the sessions, Kalina observed that Elaine has Conner's best interests at heart. Kalina had no concern regarding Elaine being Conner's guardian.

Kalina understood that the main safety issue of the juvenile case was whether Elaine's home is structured in such a way that Conner can remain safe. Kalina did not believe that Elaine had been offered appropriate services or resources to assist her as Conner's guardian. Kalina suggested during a family team meeting in July 2023 that Elaine be offered skill-building services specifically related to raising a child with developmental disabilities, intellectual delays, and autism. This resource had not been provided at the time of trial.

Lynette Otero, the family's caseworker since August 2023, testified that Conner's permanency objective at the time of trial was reunification with a concurrent goal of guardianship, which could occur with either Elaine or with Conner's biological mother. Following the Department's ex parte motion to suspend visitation, Elaine did not have contact with Conner for almost a year. Though the juvenile court initially ordered that Elaine and Conner participate in therapeutic visitation, it appears from our record that sometime later Elaine was offered supervised visitation with Conner. Otero noted that part of the Department's referral to visitation workers was a request that visitation workers provide hands-on training and education to Elaine during visits with Conner, which Otero believed was happening.

Otero acknowledged that Elaine had at times done well with redirecting and calming Conner on visits, but Otero was unsure about Elaine's ability to stay consistent in her interactions with Conner. Otero had concerns about the way Elaine manages Conner and the anxiety that he has as a result. Otero stated that Elaine "sometimes doesn't want to deal with him as an autistic child. She wants to deal with him as a regular child." During the case, Otero has seen Elaine go back and forth between "believing and not believing" Conner's autism diagnosis.

Elaine attended all family team meetings and all but one of her 6-hour weekly supervised visits with Conner. That visit was missed due to inclement weather. Elaine has also been compliant with individual therapy and obtaining a psychological evaluation. However, Otero has observed that in family team meetings, Elaine seemed indifferent to Conner's needs.

Elaine's psychological evaluation, completed in April 2023, stated that Elaine "does not have a realistic appraisal of the severity of [Conner's] mental health disorders." The evaluation recommended that Elaine begin a course of individual therapy and participate in family therapy with Conner to improve the quality of their interactions. Regarding the recommendations for Conner's placement, the evaluation stated:

> At this time, as much as [Elaine] loves her grandson, it appears that she is not really ready to assume custody of Conner. Rather than showing cooperation, the record indicates that

she has shown quite the reverse. She has resisted accepting her grandson as having autism. She has been obstructive in his care at times even going so far as asking providers to shred documents that indicate that he has autism. She is also minimizing much of his violent behaviors, even when she has been the victim of some of his attacks. Another indication why it is wise for [Elaine] not to have custody of Conner at this time, is that he appears to have calmed down and been more acceptable in foster care.

Elaine was 80 years old at the time of trial. She had previously been employed as a first-grade teacher and had been Conner's primary caregiver since he was a toddler. While Conner was in Elaine's care he was involved in 4-H, Boy Scouts, swimming lessons, and piano lessons. Elaine attended all of Conner's extracurricular activities, school functions, and medical appointments. She helped Conner with his homework and contributed to a college savings account on his behalf. Elaine has sent numerous care packages and notes to Conner since he has been placed in foster care.

Elaine wished that there had been more instruction from visitation workers on how to redirect Conner. She testified that Wiest had ignored her requests for additional supports and services. Elaine elected to take a correspondence parenting class through Boys Town. Elaine indicated that she is willing to ensure that Conner remains in therapy and that she will communicate with the Department and Conner's school to ensure continuity in his care.

Elaine told Kalina that she feels like there is a lack of communication from the service providers. An email between a previous caseworker and Wiest led Elaine to distrust the case professionals. In the email, dated August 3, 2023, the caseworker states to Wiest, "I know Elaine will slip up and do something she shouldn't. We are still working on dissolving the guardianship."

Elaine denied that Conner had recently tried to strangle her on a visit. Rather, she relayed that Conner had walked up to her and put his hands around her neck and Elaine redirected him, saying it was not acceptable to touch her there. Conner then took his hands away. Elaine stated that Conner was being "playful."

At the time of trial, Conner had been in foster care for over 2 years. Otero did not believe that reunification with Elaine was in Conner's best interests or that it was likely that Conner could return to Elaine's care in the near future. Otero testified that Elaine cannot meet Conner's needs as recommended by Edwards.

Otero testified that if the juvenile court did not terminate the probate guardianship, the Department would be limited in its ability to obtain permanency for Conner or investigate other guardians for Conner. Otero believed that it was in Conner's best interests to terminate the guardianship.

In an order entered on August 13, 2024, the juvenile court terminated the probate guardianship. The court found that Conner's behaviors had significantly improved since he was placed in foster care. The court noted that Elaine would likely struggle in providing the structure and consistency needed by Conner. Though Elaine testified that she now accepts Conner's diagnosis, Elaine's "change of heart has been a relatively recent development." Finally, the Department would be foreclosed from seeking other permanency options, including a successor guardianship, if the probate guardianship remained in place. The court concluded that termination of the guardianship would be in Conner's best interests.

Elaine appeals.

## ASSIGNMENT OF ERROR

Elaine assigns that the juvenile court erred in terminating the guardianship because termination of the guardianship was not in Conner's best interests.

## STANDARD OF REVIEW

Appeals of matters arising under the Nebraska Probate Code are reviewed for error on the record. *In re Guardianship of Issaabela R.*, 27 Neb. App. 353, 932 N.W.2d 749 (2019). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id*.

## ANALYSIS

Elaine assigns that the evidence was insufficient to demonstrate that termination of the guardianship was in Conner's best interests.

Any person interested in the welfare of a ward may petition for removal of a guardian on the ground that removal would be in the best interests of the ward, and after notice and hearing on a petition for removal, the court may terminate the guardianship. Neb. Rev. Stat. § 30-2616 (Reissue 2016).

Cases regarding termination of a guardianship generally involve a biological or adoptive parent's attempt to terminate a guardianship in order to regain custody of his or her child. Under those circumstances, the Nebraska Supreme Court has held that the parental preference principle serves to establish a rebuttable presumption that the best interests of the child are served by reuniting the child with his or her parent. See *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004). In those instances, an individual who opposes the termination of a guardianship bears the burden of proving by clear and convincing evidence that the biological or adoptive parent either is unfit or has forfeited his or her right to custody. *Id*.

But where, as here, the rights of a biological or adoptive parent are not at issue, the parental preference doctrine does not apply. *See In re Guardianship of Issaabela R., supra*. Where a parent's constitutionally protected relationship with a child is not at issue, both public policy and the Nebraska statutes require the case to be determined by reference to the paramount concern in child custody disputes—the best interests of the child. *Id*. The standard for removal of a guardian of a minor pursuant to § 30-2616 is the best interests of the ward. *Id*. Therefore, the burden in this case was on the Department, as the moving party, to establish that terminating the guardianship was in Conner's best interests.

The record reflects that Conner has autism spectrum disorder with intellectual disability and several other mental health diagnoses. Because of this, Conner has had significant behavioral issues since at least 2017. These behaviors have included pulling fire alarms, putting his hands in electrical sockets, attempting to run into the street, urinating on floors, smearing fecal matter on walls, exposing himself, and hitting, biting, and grabbing other individuals. Conner's behaviors, particularly his violence toward Elaine, was the primary reason behind the adjudication in the

juvenile case. As testified by Conner's psychiatrist and therapist, he requires significant structure and consistency in his daily activities from his caregivers and custodian.

Elaine had difficulty accepting Conner's autism diagnoses for much of the juvenile case. During the period of Elaine's denial, Edwards observed that Conner's behavioral issues would escalate when exclusively in Elaine's care (such as during extended school breaks), possibly because Elaine was not properly applying the therapeutic recommendations in her home. Elaine refused Wiest's suggestions regarding how Elaine could better support Conner's needs, because she claimed that Conner was not autistic. Elaine also refused to do family therapy with Conner, insisting that she would only participate in visits with Conner, even after Wiest explained the difference between family therapy and visitation. Conner had wanted to participate in family therapy and experienced anxiety due to Elaine's refusal. Though Elaine and her therapist testified that Elaine finally accepted Conner's autism diagnosis over a year and a half after his assessment had been completed, she struggled in collaborating with Conner's therapeutic providers and implementing the necessary structure and consistency Conner requires.

Issues identified in Elaine's psychological evaluation completed over a year before trial continued to be present in the juvenile case; including that Elaine minimizes much of Conner's violent behaviors, even when she has been the victim of some of his attacks. This was evident when Elaine described Conner as being "playful" when he put his hands around her neck during visitation.

Conner's behavior has significantly improved since he was removed from Elaine's home and placed into foster care. Edwards testified that Conner no longer takes medication designed to treat aggression and irritability. Wiest testified that Conner's foster home meets his need for a predictable and consistent environment and therefore reduces the escalation of his aggressive behaviors.

Finally, terminating the probate guardianship allows the juvenile court the option of pursuing other permanency objectives for Conner, whether with Elaine or another guardian. Ensuring that the juvenile court has the ability to choose the proper permanency objective for Conner is in Conner's best interests.

For these reasons we find that the Department established that terminating the guardianship was in Conner's best interests and the juvenile court's decision to terminate the probate guardianship conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. See *In re Guardianship of Issaabela R., supra*.

## CONCLUSION

We conclude that the juvenile court did not err in granting the Department's motion to terminate the probate guardianship over Conner.

AFFIRMED.