[26] *In re Estate of Nemetz,* 273 Neb. 918, 735 N.W.2d 363 (2007).

IN RE INTEREST OF XAVIER H., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLANT, V.
KATIANNE S., APPELLANT AND CROSS-APPELLEE.
740 N.W.2d 13

Filed October 19, 2007.    No. S-06-841.

Richard Register and Christina C. Boydston, of Register Law Office, for appellant.

Jeri L. Grachek, Deputy Dodge County Attorney, for appellee.

HEAVICAN, C.J., WRIGHT, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## NATURE OF CASE

Katianne S. is the mother of Alita, born March 14, 2001; Kalila, born April 6, 2003; and Xavier, born May 12, 2004. Katianne's fitness as a mother to Alita and Kalila is not in question, and they remain with her in the family home in Fremont, Nebraska. Katianne's petition for further review asks that we evaluate the Nebraska Court of Appeals' decision to affirm the juvenile court's termination, under Neb. Rev. Stat. § 43-292(7) (Reissue 2004), of Katianne's parental rights to Xavier. The broader issue presented in this appeal is the extent to which the State must respect a parent's fundamental constitutional rights when terminating parental rights under § 43-292(7).

## FACTS

### BACKGROUND OF XAVIER'S ADJUDICATION

After Xavier's birth, Katianne immediately suspected that Xavier might have a milk allergy because he kept spitting up breast milk. Katianne's daughter, Kalila, had been born with reflux and allergies to soy and milk proteins and had shown similar symptoms. Katianne and Xavier were discharged from the hospital within 2 days, but Katianne continued to seek medical

care for Xavier's feeding problem, taking Xavier to his pediatrician several times a week.

Xavier was eventually diagnosed with a milk and soy protein intolerance and gastroesophageal reflux. From May 12 to July 23, 2004, Xavier was put on several different hypoallergenic formulas, but he continued to spit up frequently. He was gaining weight poorly and was very irritable. Katianne explained that Xavier's allergies and reflux problem were much more severe than her daughter Kalila's had been.

On July 23, 2004, Xavier was placed on a nasogastric feeding tube which would drip formula into his stomach at a slow rate to allow him to absorb the formula without spitting it up. The feeding tube was to be in place at all times. Xavier had to wear special mittens to keep from pulling it out. He would have to go to the hospital to have the tube reinserted if he pulled it out. The pump would "alarm every once in a while," and there was a list of procedures to determine the reason for the alarm. The bags of formula needed to be refilled as soon as they were empty, and periodic tubing changes were also required.

When Xavier was 2 weeks old, Katianne had gone back to work part time at a gas station. She explained that she soon began to suffer from postpartum depression, which was getting progressively worse. She did not seek professional help. Katianne had a history of depression as a teenager and of drug and alcohol abuse as a young adult. However, Katianne was an active member of Alcoholics Anonymous and had not had a drinking or drug abuse problem since at least 2000.

Xavier was cared for by his father or a sitter while Katianne was at work. Katianne became concerned over whether they could properly care for Xavier's special needs. According to Katianne, the pediatrician suggested temporary out-of-home care as a solution. Katianne testified that she contacted social services for assistance. Crystal Hestekind, a protection and safety worker for the Department of Health and Human Services (the Department), helped Katianne get some assistance through some community service agencies, but the Department initially refused out-of-home voluntary temporary placement.

On July 28, 2004, someone filed a report with the Department expressing concerns about Xavier's health and well-being. After

an investigation, the report was deemed to be unfounded. In discussions with Katianne about the report, Katianne again expressed to the Department her concern over Xavier's care while she was at work. Hestekind had Home Health Care increase its visitation to Katianne's home to three to four times per week to assist with weight checks and the pump. Hestekind explained that they were also encouraging Katianne to seek assistance for her postpartum depression, but, at that time, Katianne was reticent to take medication.

Hestekind explained that Katianne was not very successful in keeping in communication with Hestekind, and Xavier still was not gaining any weight. Hestekind testified that she had offered to set up commercial daycare with staff properly trained for Xavier's medical needs, but that Katianne had refused because of concerns about Xavier's becoming sick by being around other children. Hestekind later admitted that the daycare she had arranged for Katianne was closed during the evening hours that Katianne worked.

Because the situation was deteriorating, on August 9, 2004, Katianne and the Department agreed to a voluntary 1-month placement of Xavier outside the home. Xavier's condition improved in the foster home. On August 23, Katianne suffered what she described as a relapse. She drank half a bottle of whiskey, took "a bunch of pills," and was hospitalized for several days as a result.

Because Xavier still needed special care to be weaned from the feeding tube to the bottle, the Department asked Katianne and Xavier's father to sign a voluntary extension of the out-of-home placement. When Xavier's father refused to agree to the extension, Xavier was adjudicated, in accordance with Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2004), to be under the jurisdiction of the juvenile court due to the parents' failure to provide proper care. The petition for adjudication alleged that Xavier's parents did not feel they were capable of caring for Xavier while he had the feeding tube.

COMPLIANCE WITH CASE PLAN

Xavier was weaned from the feeding tube to the bottle, and his special needs largely resolved. However, his adjudication began

a process in which a case plan for reunification was developed by the Department for Katianne. According to the Department, Katianne was not to be reunited with Xavier until the goals of that plan were met. The goals of the case plan included maintaining steady employment, attending therapy, submitting to random urinalysis testing, attending parenting classes, presenting a budget and receipts for the timely payment of her bills, enhancing her time management skills, maintaining a healthy lifestyle, maintaining her home in a condition suitable for visits, engaging in positive family activities, maintaining communication with service providers, and cooperating with a family support worker to set up visitation with Xavier.

The initial visitation plan under the voluntary placement had been four 2-hour visits per week. As of September 9, 2004, when the Department asked Katianne and Xavier's father to sign a voluntary extension of that agreement, Katianne had not seen Xavier for 3 weeks. She had canceled her visits with Xavier for various reasons, including illnesses of her other children, and also, presumably, for reasons relating to her August 23 hospitalization. By November, after the adjudication, visitation was reduced to twice a week. Because of further missed visits, the frequency and number of which are not reflected in the record, Katianne's visits were reduced to once a week in January 2005.

The only visitation records submitted into evidence by the Department show that between June 1 and December 2, 2005, 48 out of 59 scheduled visits between Katianne and Xavier took place. Each visit lasted approximately 2 hours. Approximately 10 visits were missed, although several canceled visits were due to family members' being ill.

In accordance with the case plan, Katianne immediately began working with Lutheran Family Services to address substance abuse and mental health issues. After an initial evaluation, Lutheran Family Services recommended a 12-week individual and group outpatient therapy program for substance abuse. Katianne had successfully completed the program by the end of December 2004. Katianne also saw a psychiatrist at Lutheran Family Services, who prescribed antidepressants. Ongoing therapy to address general mental health issues was recommended in conjunction with her medication.

Debra Hallstrom was Katianne's therapist through Lutheran Family Services. Hallstrom testified that Katianne was fairly regular in her appointments with her. Still, by the end of December 2004, Katianne had three "late cancels" with the supervising psychiatrist who prescribed her antidepressants. In accordance with Lutheran Family Services' official policy, the three late cancels mandated that Katianne be discharged for all services provided by the program, including her therapy visits with Hallstrom. During her discharge, Katianne sought therapy outside of Lutheran Family Services.

In April 2005, Katianne was allowed back into the program at Lutheran Family Services. Katianne continued her therapy at Lutheran Family Services until October or November 2005, when she was again discharged for three late cancels with her supervising physician. Hallstrom testified that at the time of her discharge, Katianne had partially completed her therapy goals, such as "boundary issues" and "setting goals." Katianne was still working on issues relating to job stability, daycare, and her dependence on Social Security income. Katianne did not have the money to pay for daycare, and she could not rely on Xavier's father to take care of the children. Hallstrom explained that Katianne was not able to get to work when a child was sick, and because of unreliable childcare, this was causing problems with her employment. Although Katianne missed visits to her supervising physician, she did continue taking her antidepressant medication.

Katianne also worked with Raegen Yount, a family support worker, to try to reach the goals of her case plan. Yount instructed Katianne in a parenting course called "nurturing parenting." Katianne successfully completed the course in approximately 11 months. Yount described that 11 months was "on the high end" for completion of the course, but that Katianne was generally engaged and was good about completing her homework for the course.

Yount testified that she had less success in teaching Katianne to properly budget her finances. According to Yount, budgeting was just something Katianne was "not able to grasp." Yount opined that Katianne and Xavier's father were spending money on unnecessary items they could not afford. She pointed out that

they rented-to-own a dishwasher, washer and dryer, bunk beds for the girls, and a "fancy stereo," which stereo was apparently later returned at Yount's urging. Yount testified that Katianne paid her bills late and that family members had often been called upon to help Katianne with her rent or utility bills. Yount also noted the fact that a used van Katianne bought had been repossessed. While Katianne had not owned another vehicle, Yount considered this purchase unnecessary.

Yount supervised Katianne's visits with Xavier. She stated her general observation that Katianne's house was not organized. The master bedroom door would often be closed because of the disarray inside. There was clothing that had been thrown down the steps of the unfinished basement where the laundry room was located. The girls had colored on the walls of their bedroom.

Yount testified that some of Katianne's visits with Xavier went very well, and some went very badly. Yount testified that the recent second-year birthday party for Xavier at Katianne's home was "very, very nice." There was cake and pizza; they sang "Happy Birthday"; and there "wasn't a whole lot of chaos, a whole lot of screaming going on or anything."

Yount explained that, in contrast, in the last few months, there had been other times where the environment had been more noisy because of the girls' behavior and Katianne's trying to discipline them. Yount recounted an incident during a May 4, 2006, visit, when Katianne tried to discipline Kalila for refusing to put her clothes back on after Kalila had stripped and decided she wanted to take a bath. Yount stated that Katianne had redirected Kalila many times to the timeout chair, but, when describing Katianne's discipline skills, Yount stated:

> And that has always been a thing with Kati[anne] and [Xavier's father] is that they will say go to time out, but whether the time out is utilized at all, or even utilized correctly, is a challenge for them. They'll get parts of a time out right, but other parts they won't. . . . It was time after time. And I directed [Katianne] to just take [Kalila] to the room. And Kalila was just left there. No direction as to why she was going to her room and no direction as to why she should get out of her room.

Yount also testified as to an incident when Katianne was changing Xavier's diaper and Alita and Kalila were "in his face" and Kalila said something about Xavier's genital area. This, according to Yount, upset Xavier. Yount testified that the girls' crowding Xavier during diaper changes was a recurring problem. She did note, however, that during the last visit, Katianne did "prompt the girls to back up . . . without any guidance or anything." But she noted that, unfortunately, the girls did not back up and that Katianne simply finished changing Xavier without disciplining the girls.

Yount stated that on most visits, Katianne was attentive to Xavier and the girls. At times, Katianne would have had a bad day and would want to talk. On such occasions, Yount stated that Katianne would be sitting on the floor and would observe the children while she talked about herself. Yount testified that other than going to the park, Katianne did not plan structured activities such as doing a craft project or going to the library. Yount indicated that Katianne had kept in good contact with Xavier's physician to discuss his health, when that was an issue.

Yount noted that Katianne had missed visits with Xavier for various reasons. Sometimes the other children were sick. Sometimes Katianne had to work early. Yount explained that she and Katianne's case manager had refused Katianne's request on one occasion to have an extended visit with Xavier at an Omaha zoo when the Head Start program was offering free admission for the children. Yount explained that Katianne had given her only 1 day's notice of the request. Moreover, gas to drive to the zoo would cost money, Katianne still had to pay admission for herself, and Katianne had mentioned renting a stroller. Yount stated, "I had the concern about money because prior to that I know relatives had helped her pay bills. And so, I had a question as to why are we making these type [sic] of judgments." The girls eventually went to the zoo with someone else, and Katianne stayed home in order to be able to visit with Xavier.

Ann Paulson, a court-appointed special advocate, likewise observed many of Xavier's visits in Katianne's home. Paulson testified that Xavier would generally interact with his two sisters while at Katianne's home, play with toys, and have a snack.

Paulson described Kalila's temper tantrum during the May 4, 2006, visit that Yount had mentioned. Paulson explained that 3-year-old Kalila threw a tantrum when Katianne tried to keep Kalila from taking off all her clothes and her "pull-up." Paulson stated that Katianne repeatedly placed Kalila in a time-out chair when Kalila left the chair without Katianne's permission. Katianne did get Kalila's dress back on, but not the pull-up. Still, Paulson explained, "it went on for quite a lengthy time, and [Katianne] got very frustrated with the situation and kinda [sic] just gave up on not knowing what to do and how to handle her." Yount eventually called Kalila over to her, put on her "pull-up," and advised Katianne to put Kalila in her room, which she did.

Paulson noted that there was a flea infestation of Katianne's home in the fall of 2005. She also noted that on one visit in January 2006, she had not received a late message that Katianne was canceling visitation. Upon arrival to Katianne's home, Paulson could clearly see inside the house that it was in "complete turmoil, and there were clothes, boxes, and toys, and all kinds of possessions of all sorts laying all over the home." On three visits, she found that the girls' beds did not have any bedding on them, although she could not say whether that was because the bedding was being washed. With these exceptions, Paulson described Katianne's home as generally clean and ready for them to visit.

Michelle Barnett, the caseworker for the Department who prepared Katianne's case plan, testified that it was her opinion that Katianne had generally not followed through with the plan the Department had set for her. Barnett testified that Katianne had been "very good" in the area of remaining drug free. Nor had she had any problem taking her psychotropic medication "in quite some time." Barnett believed that Katianne had, with the exception of the flea incident, maintained the conditions of her home up to the Department's standards, and she did not find any reports that the home was "supposedly in disarray" to be of any concern. Katianne had remained in the same residence with her two other children during the entire time Barnett was on the case. Barnett recognized that Katianne had completed the psychological and parenting assessment and had "partially" completed the recommendations of her assessments.

Barnett described the case plan goal of positive family activities as "kinda [sic] like a half complete," explaining, "she attempts to go to the park and . . . she would put a swimming pool outside and try to get them out there in that way. However, some of the visitations are very chaotic . . . ." While Katianne had requested increased visitation, "with the chaos in the home," Barnett did not allow it. Visitation had been cut back to once a week because of "a consistent amount of visitations being cancelled, and to provide Xavier with the structure that he needs in the foster home and at the daycare setting." Barnett had told Katianne once that if she could provide consistent visitation that month, Barnett would increase it, "[a]nd [Katianne] was close, but not quite."

Barnett did not think that Katianne had successfully followed the budget developed with Yount's assistance. Moreover, she noted that although Katianne had been continuously employed, she had been employed at approximately 14 different jobs. Like Yount, Barnett disapproved of the "luxury" items Katianne had rented or purchased. Barnett also stated that Katianne's bank account was constantly overdrawn; that she could not "do a savings account"; that Katianne's family "is picking up the slack, paying bills"; that the telephone had been shut off and there was no cellular telephone; and that the van had been repossessed.

As to the case plan's goal of communication with the Department, Barnett stated that Katianne was inconsistent. In the beginning, Barnett explained, contact was "very good." Katianne had even told Barnett when would be good times to do random urinalysis testing on the father because Katianne was trying to help him stay sober. Contact had recently diminished, however.

Finally, Barnett testified that Katianne had not achieved the goal of time management. Nor did she believe that Katianne had completed the task of keeping people out of her home who would be a risk to her children. Barnett explained that Katianne still had some contact with Xavier's father. Barnett admitted that the only evidence of the father's danger to the children was Katianne's report that he had on previous occasions punched and kicked walls and that he had once threatened to kick Alita.

EVIDENCE OF XAVIER'S BEST INTERESTS

Barnett admitted that she had told Katianne that it would be difficult to terminate her parental rights because Katianne had completed parts of her plan. As Barnett explained: "She is sober and she is parenting two other kids in her home." Still, Barnett stated her opinion that termination of Katianne's parental rights was in Xavier's best interests because:

> We've already heard that Xavier can be fussy. [The foster mother] has called me numerous times where he has been screaming for hours at a time just because he is very smart, he is very strong willed, and he wants to get what he wants. And, I mean, I don't know that anybody can handle that, so there's things in that regard. He's difficult. [Katianne's] life is stressful. Things are not consistent in her home. The other two children are not well managed at this point. They need consistency and Kati[anne's] time and I don't feel that she can handle three children with their needs.

Barnett explained that Xavier's foster parents were unable to adopt Xavier because of their ages. There were four prospective adoptive placements for Xavier, one being an aunt and uncle on the father's side who lived in California with their three young children. Xavier had met the aunt and uncle during one weekend visit, and Barnett claimed that Xavier had bonded to them because "he talks to them twice a month on the phone, points to [the aunt] and calls her mommy, and can point to her in a booklet as his mother, and get excited and talk to her on the phone." Xavier had not bonded with any of the other prospective adoptive families. Barnett explained that after adoption, whether Xavier had any contact with his biological siblings would be "up to Katianne and whoever adopts him."

Xavier's foster mother testified Xavier was now a happy, healthy 2-year-old with age-appropriate development. The foster mother seemed to agree that he was "somewhat high maintenance," explaining:

> You know, I guess if I had more small children, you know, Xavier can be clingy, and when he is it's really hard to get him settled down, and if I had more little kids that I was having to — you know, get everybody to bed and baths on time and stuff, I think I would have a hard time getting

everybody's needs met and keeping him calm. He wants to be picked up. He wants attention.

The foster mother testified that Xavier usually behaved "just fine" after his visits with Katianne, although on three occasions in August and September 2005, Xavier acted out by hitting or throwing toys after his visits. These episodes seem to correspond to a period where Xavier was generally experiencing more temper tantrums. The foster mother explained that the frequency of Xavier's temper tantrums had generally diminished since that time.

Katianne testified that she had ended her relationship with Xavier's father and that he no longer lived in her home. She still had some contact with him because of his relationship with his children. Katianne stated that she wished to move back to New Jersey, where her family and friends were, because she would have a network of support there. She testified that she was currently employed full time as a security guard and was trying to complete some online college courses. Katianne stated that although she had had several different jobs in the recent past, she had lost many of them when they conflicted with her children's needs. In the last couple of months, she had worked out an arrangement with another mother in her neighborhood to take turns babysitting while the other was at work. Katianne said that this arrangement was working out well and that she trusted the other mother with her children.

Katianne described the routine she had established for her girls, indicating that establishing a routine was something she had learned as a result of the parenting course and counseling. Katianne thought that the routine helped with the children's behavior. The routine included set mealtimes, snacks, naptime, playtime while Katianne did household chores, and a bath and bedtime routine which included television or stories.

Katianne explained that she believed it was in Xavier's best interests that her parental rights not be terminated:

I believe my son should be with his mother. . . . He still recognizes me as mom. He still calls me mom. We walk up and down the street in front of the house and he points and says it's mom's house. Not just for the best interests of him, but for the other children also. For anyone whose

[sic] ever had more than one child, and had to go to their own child or take their children to another child's funeral, that's how it will feel to my children. Not just me, but to my other two daughters, because it's not like they don't know them. It's not like they don't play together.

Katianne stated she is a single mother with no support system in Fremont and that although she was not wealthy, she had always met her children's needs. They had a home to live in, beds and bedding, food, and clothing. Katianne testified that she had made mistakes in the past but that she was working to fix those mistakes. Katianne noted that the uncle and aunt in California never acknowledged their niece, Xavier's sister, Kalila, on any occasion, including birthdays or Christmas. She doubted they would work to maintain a relationship between Xavier and the girls. Katianne stated that there was a possibility that in transitioning back to her home, she would take Xavier to a therapist, explaining, "I think therapy is a positive thing."

### Clinical Parenting Evaluation

Pursuant to the case plan, Dr. Stephen Skulsky, a clinical psychologist, conducted a psychological evaluation of Katianne to determine her capacity to parent and conducted a parent bonding assessment with Kalila and Xavier. Skulsky's assessment showed that Katianne enjoyed family interactions. She was extroverted, had a strong interest in interpersonal relationships, and had a good knowledge of socially expected and conventional behaviors. She had good underlying empathic capacities. Katianne was also assessed as having a broad range of intellectual interests, "good reality testing," and "a good capacity to break situations apart and put them back together into a global or overall picture of what is occurring."

Skulsky concluded that Katianne was likely to be strongly bonded to her children. Also, she was able to talk about appropriate discipline for the different ages of her children and appropriate ways to show them affection, and was able to list some favorite foods, favorite activities, and developmental levels for all three of her children.

Skulsky's diagnostic impression of Katianne was "of an adjustment disorder with a mixture of upset feelings," which

was connected to Xavier's being taken from the home. Skulsky described Katianne's biggest fear as not getting Xavier back. Katianne had told Skulsky that her happiest times in her life was when all three children were together. Skulsky concluded that "[u]nder most circumstances, when not too strongly emotionally upset, [Katianne] is likely to be able to put her children's needs first. . . . When strongly emotionally stressed, she may be briefly unable to make appropriate judgments in handling her children. This constitutes a mild difficulty in [her] capacity to adequately parent."

In the bonding assessment, Skulsky stated that he observed that Katianne talked and played with the children in an age-appropriate manner, that she set appropriate verbal and behavioral limits for the children, and that she demonstrated a good capacity to be warm and engaging with the children. The children warmed up to Katianne as well.

Skulsky summarized in his report that Katianne could take care of and relate to her children in an appropriate manner. Because of limitations in her ability to set firm and consistent limits and make good judgments when too strongly stressed, Skulsky recommended ongoing courses of psychotherapy to further limit any concerns about difficulties in appropriate parenting.

Skulsky's testimony at the termination hearing clarified that Katianne's deficiencies could be adequately addressed by 6 to 18 months of therapy. He stated that they were "not the kind of more severe pervasive problems that some parents would have, where it would be years and years of therapy." Because by the time of the hearing Skulsky had not seen Katianne for approximately a year, Skulsky could not opine on whether she had adequately worked on her personality issues and underlying emotional struggles since his assessment.

Skulsky could opine that Katianne was bonded to Xavier. He could not opine on whether Xavier was deeply bonded to Katianne because such an evaluation could be made only through frequent observational visits, which he had not made. Skulsky stated that if Xavier had not bonded to Katianne, but had bonded to his foster family, then it would be difficult, after 18 months, to return to Katianne. It would, however, be equally

difficult for Xavier to leave his foster parents for an adoptive family to whom he was not yet bonded.

## KATIANNE'S ONGOING COUNSELING

After being discharged from Lutheran Family Services, Katianne sought the help of Cynthia Jane Cusick, a mental health counselor and therapist. Cusick testified that she had been counseling Katianne once a week for the past 6 months. Cusick described Katianne's primary issue as major chronic depression with "financial family stressors and economic stressors." Cusick explained that Katianne had made all but two of her scheduled appointments with her. One appointment was missed due to work, and the other one had been scheduled the night before the hearing, and had only been tentatively scheduled in case it was needed.

Cusick described that Katianne was doing well with her sobriety and that it was not a major issue. As to issues relating to her depression, Cusick testified that Katianne was making steady improvement in "baby steps." It would require lifetime intervention and treatment. Cusick believed that Katianne had been doing well raising Xavier's siblings. Cusick testified that having an intimate relationship with Xavier's father and letting him live in her house were "greater stressor[s] than all of the children put together." However, Katianne had ended her relationship with Xavier's father.

## TERMINATION OF PARENTAL RIGHTS

After Xavier had been in foster care for 15 months, the Department abandoned its reunification plan and sought termination of Katianne's parental rights under § 43-292(6) and (7). Subsection (6) allows for termination if such termination is in the best interests of the child and reasonable efforts to preserve and reunify the family have failed to correct the conditions leading to the determination that the juvenile was as described by § 43-247(3)(a). Subsection (7) provides for termination if it is in the best interests of the child and the child has been in out-of-home placement for 15 or more of the most recent 22 months. Xavier's father voluntarily relinquished his parental rights at the beginning of the proceedings.

The State and the guardian ad litem argued for termination of Katianne's parental rights because Xavier deserved permanency and Katianne had failed to sufficiently follow her case plan. Both pointed out that Katianne could not budget her finances and had trouble keeping the same job. Both pointed out that Katianne's visits with Xavier were only once a week and that they had been reduced to once a week because she had missed visits.

The juvenile court specifically found that the Department had failed to prove that, after reasonable efforts to preserve and reunify the family, Katianne had failed to correct the conditions leading to the § 43-247(3)(a) adjudication. Thus, it refused to terminate under § 43-292(6). Instead, the court terminated Katianne's parental rights under § 43-292(7). The court's order did not specify the basis for its determination that termination was in Xavier's best interests.

### APPEAL TO COURT OF APPEALS

In a memorandum opinion filed on February 5, 2007, the Court of Appeals affirmed the termination of Katianne's parental rights. The court stated that it was undisputed that Xavier had been in out-of-home placement for 15 or more of the most recent 22 months and that children should not have to wait indefinitely for indefinite parental maturity. The Court of Appeals concluded that termination under § 43-292(7) was in Xavier's best interests, pointing out Katianne's deficiencies in meeting her case plan's goal of budgeting and stability in employment. Apparently in reference to Katianne's being discharged for late cancels from Lutheran Family Services, the Court of Appeals also noted that Katianne had not been consistent in attending therapy for her mental health needs. The Court of Appeals stated that Katianne had been inconsistent with visitation and had difficulty managing her household with the two other children. Finally, the Court of Appeals stated that Xavier's father was still present in Katianne's life and that he was a negative influence.

We granted Katianne's petition for further review.

### ASSIGNMENTS OF ERROR

Katianne asserts that the juvenile court erred in (1) determining that her parental rights should be terminated pursuant to § 43-292(7), (2) determining that it would be in Xavier's best

interests to terminate Katianne's parental rights, (3) refusing to declare § 43-292(7) unconstitutional as violative of Katianne's fundamental substantive due process rights under the 14th Amendment, (4) not requiring the Department to prove noncompliance with a reasonably related rehabilitation plan prior to termination, and (5) not determining that the Department failed to prove by clear and convincing evidence the grounds for termination. The State cross-appeals, asserting that the juvenile court erred in failing to find that the State had proved that Katianne's parental rights should be terminated under § 43-292(6).

## STANDARD OF REVIEW

■ Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings.[1]

## ANALYSIS

■ Under § 43-292, in order to terminate parental rights, the State must prove, by clear and convincing evidence, that one or more of the statutory grounds listed in this section have been satisfied and that the termination is in the child's best interests.[2] Katianne's parental rights were terminated under § 43-292(7). This court upheld the constitutionality of § 43-292(7) in *In re Interest of Ty M. & Devon M.*,[3] and we do not revisit that holding here. However, we do find that the juvenile court erred in finding termination to be in Xavier's best interests. Accordingly, we reverse.

The proper starting point for legal analysis when the State involves itself in family relations is always the fundamental constitutional rights of a parent.[4] The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by the U.S. Supreme

---

[1] *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006).

[2] See *id.*

[3] *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003).

[4] See *In re Adoption of Victor A.*, 157 Md. App. 412, 852 A.2d 976 (2004).

Court.[5] "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it. 'If the State prevails, it will have worked a unique kind of deprivation.'"[6]

██ That being so, the U.S. Supreme Court has been clear that the Due Process Clause of the U.S. Constitution would be offended "'[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness . . . .'"[7] "[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship."[8]

We have likewise said repeatedly that "[a] court may not properly deprive a parent of the custody of a minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship, or has forfeited that right."[9] "'[N]ature demands that the right [to custody of the child] shall be in the parent, unless the parent be affirmatively unfit.'"[10]

██ The fact that a child has been placed outside the home for 15 or more of the most recent 22 months does not demonstrate parental unfitness. Instead, as we explained in *In re Interest of Ty M. & Devon M.*,[11] the placement of a child outside the home for 15 or more of the most recent 22 months under § 43-292(7) "merely provides a guideline" for what would be a

---

[5] *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

[6] *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

[7] *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978).

[8] *Santosky v. Kramer, supra* note 6, 455 U.S. at 760.

[9] *Gomez v. Savage*, 254 Neb. 836, 848, 580 N.W.2d 523, 533 (1998). See, also, e.g., *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004); *In re Interest of Amber G. et al.*, 250 Neb. 973, 554 N.W.2d 142 (1996).

[10] *In re Guardianship of D.J., supra* note 9, 268 Neb. at 247, 682 N.W.2d at 245.

[11] *In re Interest of Ty M. & Devon M., supra* note 3.

reasonable time for parents to rehabilitate themselves to a minimum level of fitness.[12] As stated by the Supreme Judicial Court of Massachusetts,[13] regardless of whether the child has been in foster care for 15 out of the last 22 months, the State "always bears the burden of proving, by clear and convincing evidence, that a child is still in need of care and protection."[14] This burden, the court explained, "necessarily involves showing that the parent is still unfit and the child's best interests are served by remaining removed from parental custody."[15]

Section 43-292 nowhere expressly uses the term "unfitness," but that concept is encompassed by the fault and neglect described in subsections (1) through (6), where applicable, and, for all subsections, by a determination of the child's best interests. Although the name of the "'best interest of the child'" standard may invite a different "'intuitive'" understanding, "[t]he standard does not require simply that a determination be made that one environment or set of circumstances is superior to another."[16] Rather, as we have explained, "the '"best interests" standard is subject to the overriding recognition that the "relationship between parent and child is constitutionally protected."'"[17] There is a "rebuttable presumption that the best interests of a child are served by reuniting the child with his or her parent."[18] Based on the idea that "fit parents act in the best interests of their children,"[19] this presumption is overcome only when the parent has been proved unfit.

In this case, it is clear that the State has failed to consider Katianne's commanding interests and has failed to rebut the

---

[12] *Id.* at 174-75, 655 N.W.2d at 692.

[13] *In re Erin*, 443 Mass. 567, 823 N.E.2d 356 (2005).

[14] *Id.* at 568, 823 N.E.2d at 359.

[15] *Id.* at 572, 823 N.E.2d at 361.

[16] *In re Yve S.*, 373 Md. 551, 565, 819 A.2d 1030, 1038 (2003).

[17] *In re Guardianship of D.J., supra* note 9, 268 Neb. at 246-47, 682 N.W.2d at 245.

[18] *Id.* at 244, 682 N.W.2d at 243.

[19] *Troxel v. Granville, supra* note 5, 530 U.S. at 68. See, also, *Parham v. J. R.*, 442 U.S. 584, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979).

presumption that it is in Xavier's best interests to reunite with Katianne. The State admits Katianne is an adequate parent to her other two children. It has failed to show any reason why Katianne would not be an adequate parent to Xavier as well.

Xavier's special medical needs, which were the sole basis of his adjudication, are no longer present. The record shows that Katianne completed a parenting course and has improved in her parenting skills. She is employed. She has continued her medication and has stayed sober. She has diminished her contact with Xavier's father, who apparently had a negative influence on her life. She has attempted to maintain a bond with Xavier, attending most of her scheduled visitations.

Skulsky's parenting evaluation determined that Katianne was a capable parent so long as ongoing therapy addressed some of her mental health issues. Katianne is attending ongoing therapy and making progress in her therapy goals. There is no evidence that Katianne could not or would not provide for Xavier's basic needs. There is no evidence that Xavier would be subjected to abuse or neglect.

The fact that Katianne is deficient in her time management, budgeting, organization, and implementation of the "timeout" technique does not make her an unfit parent. " '[T]he law does not require perfection of a parent.' "[20] Rather,

> so long as a parent adequately cares for his or her children (*i. e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.[21]

We are most troubled by the Department's argument that Katianne can handle two, but not three children, inviting the arbitrary removal of one. Nor does the fact that the State considers certain prospective adoptive parents "better" overcome the constitutionally required presumption that reuniting with Katianne is best. " "The court has never deprived a parent of the

---

[20] *In re Interest of Aaron D.*, 269 Neb. 249, 265, 691 N.W.2d 164, 176 (2005).

[21] *Troxel v. Granville, supra* note 5, 530 U.S. at 68-69.

custody of a child merely because on financial or other grounds a stranger might better provide.'"[22]

Much concern has been expressed over Xavier's need for permanency and his extended stay in foster care. The record suggests that Xavier can find permanency with his natural mother, to whom he should have been returned as soon as it was safe to do so. There is little question that the alleged deficiencies in Katianne's parenting would not have justified Xavier's removal from the family home had they been the basis upon which the Department had sought adjudication in the first place. They should not have served to keep him out of the home once the reasons for his removal had been resolved; neither should a child be held hostage to compel a parent's compliance with a case plan when reunification with the parent will no longer endanger the child.

Because termination of Katianne's parental rights was not proved to be in Xavier's best interests, her parental rights could not be terminated under either § 43-292(6) or (7). Therefore, we need not consider the State's cross-appeal.

## CONCLUSION

Termination of parental rights is permissible only in the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code.[23] The State has failed to prove that termination is in Xavier's best interests because it has failed to prove that Katianne is unfit. We, therefore, reverse the judgment of the Court of Appeals, and remand the cause to that court with directions to reverse the judgment of the juvenile court.

REVERSED AND REMANDED WITH DIRECTIONS.

CONNOLLY, J., participating on briefs.

---

[22] *In re Guardianship of D.J., supra* note 9, 268 Neb. at 247, 682 N.W.2d at 245.

[23] See, *id.*; *In re Interest of Kantril P. & Chenelle P.*, 257 Neb. 450, 598 N.W.2d 729 (1999); *In re Interest of Crystal C.*, 12 Neb. App. 458, 676 N.W.2d 378 (2004).